Minnie B. FEINMAN, et al., Appellants,

v.

The STATE of Texas, Appellee.

No. 01–85–0528–CV.

Court of Appeals of Texas,
Houston (1st Dist.).

July 17, 1986.

Rehearing Denied Sept. 25, 1986.

Thomas W. McQuage, Dibrell & Greer, Galveston, for appellants.

Jim Mattox, Atty. Gen., Mary F. Keller, Exec. Asst. Atty. Gen., for Litigation, Nancy N. Lynch, Chief, Environmental Protection Div., Ken Cross, Linda A. Secord, Asst. Attys. Gen., Austin, for appellee.

Jean F. Powers, for Legal Foundation of American, Houston, Patricia Gray, for Peter A. Bowman, et al., Galveston, amicus curiae.

Before SAM BASS and DUGGAN, JJ., and KEITH, visiting retired J., also sitting.

## OPINION

SAM BASS, Justice.

This appeal concerns a strip of beach running from the Galveston seawall to San Luis Pass ("West Beach") and the effect that the receding beach line has on the State's easement along West Beach.

Appellants each own property on West Beach that was damaged when Hurricane Alicia ("Alicia") battered the Texas Gulf Coast in August of 1983. Not long after Alicia, the Attorney General notified some of the Appellants that they were in violation of the Open Beaches Act[1] ("the Act") because all or a portion of their properties were seaward of the post-Alicia vegetation line.[2] In response, appellants brought a declaratory judgment suit, requesting the trial court to enter a judgment interpreting the Act in their favor. Appellants claimed that the Attorney General was preventing them from building, rebuilding, or repairing structures that were seaward of the post-Alicia line, and prayed: (1) that the trial court declare that the post-Alicia vegetation line was not the vegetation line contemplated by the Act as the landward boundary of the public's easement; (2) that the trial court locate the vegetation line at the pre-Alicia vegetation line; and, (3) that their ownership not be altered by the changes wrought by Alicia. Appellants also argued that the State was estopped by principles of res judicata from litigating on the State's theory of a rolling easement because that issue had been litigated and decided against the State in 1975.

The State counterclaimed, requesting that the trial court declare that the public has an easement over all land located seaward of the natural line of vegetation, and that this easement shifts with the movement of the natural line of vegetation and the mean low tide line. Finally, the State requested a declaration that it was properly construing the Act.

The case was tried before the 10th Judicial District Court of Galveston County. The court concluded that: (1) the public has acquired an easement up to the vegetation line by showing prescriptive use, implied dedication, and customary use; (2) this easement is a "rolling easement" that moves as the natural line of vegetation moves; and (3) such an easement is consistent with, and implicit in, the Act. The court also found that Hurricane Alicia caused the natural line of vegetation to move in a landward direction and that the State was not barred by principles of res judicata from bringing the lawsuit against appellants.

Appellants raise 11 points of error that, for convenience, are divided into six areas of discussion. First, appellants claim that the Attorney General is estopped from litigating the rolling easement theory because that theory was litigated and determined against the State in *John L. Hill, Attorney General v. West End Encroachment, et al.*, Cause No. 108,156, in the 122nd District Court, Galveston County, Texas. Second, appellants urge that a rolling easement is foreign to, and inconsistent with, the statutory scheme of the Act. Third, appellants claim that the public's easement could not shift to the post-Alicia vegetation line because there is no evidence of the essential elements of prescriptive use, implied dedication, and customary use. Fourth, appellants contend that the court erred in concluding that the natural line of vegetation moved in a landward direction after Alicia because the vegetation line con-

1. Tex.Nat.Res.Code Ann. sec. 61.001 et seq. (Vernon 1978 & Vernon Supp.1986). All statutory citations are to Tex.Nat.Res.Code Ann. unless otherwise noted.

2. The "line of vegetation" is "the extreme seaward boundary of natural vegetation which spreads continuously inland." Tex.Nat.Res. Code Ann. sec. 61.001(2) (Vernon 1978).

templated by the Act is a stable line that Alicia obliterated. Fifth, appellants claim that the trial court erred in concluding that the movement of the vegetation line was the result of erosion rather than avulsion. Finally, appellants argue that the rolling easement theory is unconstitutional, and deprives Appellants of due process of law, due course of law, and equal protection under the 14th Amendment to the United States Constitution.

Appellants have not questioned the factual sufficiency of the evidence to support the trial court's conclusions of law and findings of fact. They claim that there is no evidence to support them or, in the alternative, that the trial court erred as a matter of law, e.g., in its interpretation of the Act. We are required to review "no evidence" points of error in a light most favorable to the trial court, looking only to the facts supporting the trial court's judgment. *Moody v. White,* 593 S.W.2d 372, 377 (Tex.Civ.App.—Corpus Christi 1979, no writ); *Seaway Co. v. Attorney General,* 375 S.W.2d 923, 937 (Tex.Civ.App.—Houston [1st Dist.] 1964, writ ref'd n.r.e.).

## I. ESTOPPEL BY RES JUDICATA

In their first point of error, appellants argue that the State was estopped from claiming a "rolling easement" because that issue was decided against the State in *John L. Hill, Attorney General v. West End Encroachment, et al.,* (hereinafter referred to as *West End* ). The *West End* case involved the location of the public's easement on the beaches of Galveston beginning west of the Seawall and extending to San Luis Pass. Appellants allege that the State's pleadings contained a request that its relief "apply to such area of the West Beach wherever the line of vegetation may be at anytime in the future." According to appellants, this language injected the rolling easement issue into the *West End* suit. Appellants also allege that the *West End* judgments show that the trial court found against the State on the rolling easement issue, and that the princi-

ples of res judicata prevent the State from relitigating the issue.

Although appellants allege that the rolling easement issue was pleaded and litigated by the State, we find no evidence in the record to support this. Only the judgments from the *West End* case were introduced into evidence, and the relevant ones contain no language indicating whether or not the issue was litigated. The record contains no pleadings from that suit. The burden is on Appellants to prove that the issue was litigated. *Puga. v. Donna Fruit Co.,* 634 S.W.2d 677, 680 (Tex.1982). They did not produce the evidence necessary to prove this. Appellant's first point of error is overruled.

## II. THE ROLLING EASEMENT

The second area of contention concerns whether the public's easement to the vegetation line is a rolling easement and whether such an easement was contemplated in the Open Beaches Act. The State requested the trial court to find that the State has established an easement to the vegetation line along West Beach and that this easement shifts with the movement of the natural line of vegetation and the mean low tide line. Appellants, on the other hand, claim that a rolling easement is contrary to the Act because it virtually gives the public an easement to the vegetation line, whereas the Act creates only a rebuttable presumption that the public has an easement to a specific vegetation line. According to appellants, then, a rolling easement gives the public greater rights in the beach than does the Act. The question confronting us is whether the Act requires the State to re-establish its easement each time the line of vegetation moves, or whether the Act allows the public's easement to move with the line of vegetation once the public has established an easement to a particular line of vegetation. In our discussion we will assume that the public has acquired an easement to some pre-Alicia line of vegetation and discuss only whether an easement, once established, can move with the vegetation line.

In reviewing a statute to discern its intent, a court must be mindful of the following presumptions:

(1) a just and reasonable result is intended;

(2) a result feasible of execution is intended; and

(3) public interest is favored over any private interest.

*See* Tex.Govt.Code Ann. sec. 311.021 (Vernon Supp.1986).

Whether or not the statute is ambiguous on its face, a court may also consider the following:

(1) the object sought to be attained;

(2) the circumstances under which the statute was enacted;

(3) the legislative history;

(4) the common law, including laws on the same or similar subjects; and

(5) the consequences of a particular construction.

*See* Tex.Govt.Code Ann. sec. 311.023 (Vernon Supp.1986).

The Act was enacted in 1959 to declare the State's policy that the public should have unrestricted access to the state-owned beaches, or to any larger area up to the vegetation line to which the State had acquired an easement, and to ensure that this right not be adversely affected in any way. *See* sec. 61.011 (Vernon 1978). The public beach is defined under the Act as any beach area "extending inland from the line of mean low tide to the line of vegetation ... to which the public has acquired an easement ... by prescription, dedication, presumption, or has retained a right by virtue of continuous right in the public since time immemorial, as recognized in law and custom." Sec. 61.001(2) (Vernon 1978). A littoral owner is an owner of land adjacent to the shore or adjacent to a waterway. Sec. 61.001(4) (Vernon 1978).

Section 61.013 prohibits the construction of barriers that will interfere with the right of the public to use any public beach, and section 61.014 prohibits any signs or warnings stating that the public does not have a right of access to a public beach. Each of these sections contain their own definition of "public beach." Section 61.013 defines public beach as "any beach bordering on the Gulf of Mexico which extends inland from the line of mean low tide to the natural line of vegetation bordering on the seaward shore of the Gulf of Mexico, or such larger contiguous area to which the public has acquired a right of use or easement to or over by prescription, dedication, or estoppel, or has retained a right by virtue of continuous right in the public...." Sec. 61.013(b) (Vernon Supp.1986). Section 61.-014 defines public beach as,

the area extending from the line of mean low tide of the Gulf of Mexico to the line of vegetation ..., if the public has acquired a right of use or easement to or over the area by prescription, dedication, or has retained a right by virtue of continuous use in the public.

Sec. 61.014 (Vernon 1978). Finally, sec. 61.020, which involves suits brought or defended under the Act, provides that,

a showing that the area in question is located in the area from mean low tide to the line of vegetation is prima facie evidence that:

(2) there is imposed on the area, subject to proof of easement, a prescriptive right or easement in favor of the public for ingress and egress to the sea.

Sec. 61.020 (Vernon 1978).

Appellants argue that the above sections reflect the legislature's intent to establish a rigid line and to require that the public always prove its easement to the vegetation line whenever a new line is created.

At the time this suit was brought, the Act did not specifically say that the State's easement could shift automatically as the vegetation line moved; but, neither did the Act specifically say that the State's easement could not move automatically with the vegetation line. Amendments, which seem to presume a moving vegetation line, have been made to the Act since Alicia, but we have not considered them in making our decision because they were added after the

events concerned in this suit occurred. *See* sec. 61.025 (Vernon Supp.1986).

▮ Although the Act does not specifically state that the public's easement moves with the vegetation line, we conclude that such intent is implicit in the Act. We reach this conclusion by considering: (1) the relevant law, (2) the purposes of the Act, (3) the consequences of interpreting the Act in the way urged by Appellants, and (4) public and private interests in the beach. As noted above, we emphasize that our review is limited to a very narrow question. Does the public's easement, once established to a particular vegetation line, move automatically with the vegetation line?

Two lines of cases are appropriate for consideration in answering the question: cases discussing the nature and division of rights between the public and private landowners along beaches, and cases involving public easements along rivers.

Because of the importance of the sea to commerce and to trade among nations, and because of the importance of beaches to the continuation of commerce and recreation, a portion of the beaches has always been reserved for, and owned by, the state or nation bordering the beaches. Private landowners may own the property immediately behind the beach. The division between public and private ownership under the common law, which governs Texas grants after 1840, is the mean high tide line. *Luttes v. State*, 159 Tex. 500, 537–540, 324 S.W.2d 167, 191–193 (1958); Dinkins, *Texas Seashore Boundary Law*, 10 Hous.L.Rev. 43, 45–46 (1972). The state or nation owns that portion of the beach, sometimes called the "wet beach," that is between the mean low and mean high tide lines. *Humble Oil & Refining Co. v. Sun Oil Co.*, 190 F.2d 191, 194–195 (5th Cir. 1951). One cannot determine the boundary between the state and the private landowner's land without considering the changing tides, for the mean low and mean high tide lines are averages of the low and high tides. Thus, the very division between private and public ownership has, since common law, incorporated the daily ebb and flow of the sea.

In addition to the daily tidal changes, the common law also recognized that more permanent changes can occur to a shoreline. Consequently, rules of law evolved governing accretions to a beach because of a receding sea, and losses to a beach because of an encroaching sea. When the sea or other body of water has gradually or imperceptibly eroded a beach or shore, the littoral owner loses title to the land covered by the sea. *Nebraska v. Iowa*, 143 U.S. 359, 12 S.Ct. 396, 36 L.Ed. 186; *City of Corpus Christi v. Davis*, 622 S.W.2d 640, 644 (Tex.App.—Corpus Christi 1981, no writ). In like fashion, when a beach has accreted because of a receding sea, the littoral owner gains title to the land added to the beach. This change in title is automatic. *See City of Corpus Christi v. Davis*, 622 S.W.2d 640, 644 (Tex.App.—Corpus Christi 1981, no writ).

Not only can *title* change because of the advances and retreats of the sea, but the *location and extent of easements* along waterways can change because of accretion or erosion to land along a waterway. This proposition that a public easement may move with the changes in the waterways it borders is not a novel idea. Courts have upheld the concept of a rolling easement along rivers and the sea for many years without using the phrase "rolling easement." The cases addressing the issue have refused to allow the purposes of a public easement to be defeated because of a change in the waterway the easement bordered. They have held that an easement is not so inflexible that it cannot accommodate changes in the terrain it covers. *See Barney v. City of Keokuk*, 94 U.S. (4 Otto) 324, 339–340, 24 L.Ed. 224 (1876); *Luttes v. State*, 159 Tex. 500, 534–540, 324 S.W.2d 167 (1958); *County of Hawaii v. Sotomura*, 55 Hawaii 176, 517 P.2d 57, 61 (1973); *Horgan v. Town Council*, 80 A. 271 L. 1911); *City of Chicago v. Ward*, 169 Ill 629, 48 N.E. 927 (Ill.1897); *Godfrey v. City of Alton*, 12 Ill. 29, 36 (1850); *Mercer v. Denne*, ch. 538 (1905). In

short, the case law certainly approves the rolling easement concept.

The object of the Act, and the consequences of the construction advocated by appellants, also lead us to conclude that the public's easement moves with the changing tide. The purpose of the statute is to provide the public with unrestricted access to the state-owned beaches, or to any larger area up to the vegetation line to which the public has acquired an easement, and to ensure that this right is not adversely affected. Sec. 61.011 (Vernon 1978). Assuming that the public established an easement to some pre-Alicia line of vegetation, the rigid construction advocated by Appellants would greatly diminish the public's easement. In fact, the easement in some instances eventually would disappear. Such a construction would defeat the purposes of the Act and would favor private interests over the public interest.

Finally, the result appellants argue for is not feasible. It would make the location of seaward boundaries pure guess work, and would eventually result in private citizens owning land under the sea. *See Coastal Industrial Water Authority v. York*, 532 S.W.2d at 951, n. 1.

For the above reasons, we conclude that the vegetation line is not stationary and that a rolling easement is implicit in the Act.

### III. AN EASEMENT TO THE VEGETATION LINE

Having found that the easement is a rolling easement, we next consider appellants' third area of contention, that the State failed to prove the criteria necessary to establish an easement by prescriptive use, implied dedication and customary use. We also discuss appellants' claim that a rolling easement dispenses with the elements necessary to show an easement by prescriptive use, adverse use, or customary use.

This Court was presented with this same question in *Seaway Co. v. Attorney General*, 375 S.W.2d 923 at 935–939 (Tex.Civ. App.1964). We decided that the State had an easement on West Beach up to the vegetation line based on a showing of prescriptive use and implied dedication. Some of the testimony in the two cases is the same; much of the testimony is very similar. The trial judge had the following facts before him when he reached his conclusion that the State has an easement to the vegetation line by a showing of prescription, implied dedication, and custom.

### A. THE FACTS

As with many sea ports, Galveston has a rich history. A history of Galveston introduced into evidence recites that Carancahua and Tonkaway tribes frequented Galveston Island prior to 1815 to hunt or fish. In 1836, a ferry was established at San Luis Pass enabling travel along the beach from Galveston to cities south of San Luis Pass. By 1851, the use of the beach between San Luis Pass and Galveston was of such a magnitude that the beach was designated a road on an official map of Texas for that year. The map shows the road running the length of Galveston through San Luis Pass into Matagorda County.

By 1858, the Texas Almanac reported that the beach "extend[ed] the whole length of the island, nearly east and west, almost perfectly straight, as smooth and hard as the floor, and afford[ed] room at ordinary tides for six or eight carriages to drive abreast." The 1859 Texas Almanac contains a description of traveling facilities in Texas via U.S. mail carrier. One of the routes listed travel from Galveston via Velasco Pass, the southern tip of West Beach, to Matagorda. Travel was by horsedrawn coach or hack and was said to be as good as any travel service anywhere. In 1903, the beach was described as being wide and smooth and forming a firm and beautiful drive for the entire length of the island.

Several witnesses testified concerning the use of West Beach between 1930 and 1985. West Beach was like a park to them and to the others who used it. It was used for a variety of purposes: fishermen would net along the beach, some would swim in

the surf, others would park their cars near the sand dunes and the vegetation line, and would picnic and camp there. One of the witnesses said he had driven every mile of West Beach in his lifetime and had always noticed people using all of the beach, from the water to the vegetation line, wherever the vegetation line was located. People who went to the beach to camp, would camp as near the dunes and the vegetation line as possible. When people parked on the beach for any length of time, they would park as close as possible to the dunes and the vegetation line to avoid on-coming cars.

Much of the testimony concerned the use of West Beach for a road. This use of the beach dates back to 1836, as noted above. In the 1930's and 40's, the only road from Galveston to San Luis Pass was the beach. Trash barrels were placed within 50 to 60 feet of the vegetation line and were dispersed all along the beach. One witness said that in the 1950's, there were two ways to get to West Beach. One was to drive to the west end of the seawall, down a ramp and onto the beach. Many times this witness drove the length of the beach from the seawall to San Luis Pass and saw many people doing the same thing. In fact, there were two to three lanes of traffic then. By 1956, West Beach was so widely used as a road that the Court of Criminal Appeals, in response to a defense that the beach was not a public road, held that the beach qualified as a public road. *See Brown v. State*, 163 Tex.Crim.R. 170, 289 S.W.2d 942, 943–944 (1956).

The testimony also showed that the public used the beach after Hurricanes Carla (1961) and Alicia (1983) as they had before; if the vegetation line moved, their use of the beach shifted to encompass the new vegetation line. Witnesses noted that there was never a time when they were on the beach that other people were not also using the beach. None of the witnesses ever asked permission of a littoral owner to go on the beach, and they never saw any-one else asking permission to be on the beach.

## B. PROOF OF THE THREE TYPES OF EASEMENT

The only question remaining under this fourth area of contention is whether the foregoing facts proved the State's claim of an easement to the vegetation line. The trial court concluded that the State proved an easement by implied dedication, prescriptive use, and customary use. To obtain an easement by implied dedication, one must show that the landowner intended to dedicate land to public use. The intent need not be manifested by an expression of intent to dedicate, but may be manifested by an act or course of conduct. This Court held in *Seaway* that "[t]he act of throwing open property to the public use, without any other formality, is sufficient to establish the fact of dedication to the public; and if individuals, in consequence of this act, become interested to have it continue so, the owner cannot resume it." *Seaway Co. v. Attorney General*, 375 S.W.2d at 936.

The State established an easement by implied dedication in *Seaway*. There is no practical difference between the facts of *Seaway* and those of this case. The littoral owners were shown in both cases to have opened the beach to public use for over a hundred years. None of the witnesses were ever told to get off the beach and did not know of anyone who was told to leave any portion of the beach. No fences were erected on the beach beyond the vegetation line. The beach area was so well-traveled and well-recognized as a road for travel that a man was given a ticket under a law applicable only to travel on public roads. *See Brown v. State*, 289 S.W.2d at 942. The City of Galveston parks department placed trash cans on the beach near the vegetation line, and city parks department employees were in charge of keeping the beach clean between the water and the vegetation line.

Appellants argue that they have also used the beach and that this would defeat a finding of implied dedication. The evidence they cite us shows only that subdivisions

were platted to the vegetation line and that houses were built up to, but not beyond, the vegetation line. This testimony is not inconsistent with the evidence presented by the State and the conclusion reached by the trial judge.

Appellants also claim that an implied dedication cannot be shown because the easement is not a well-defined or well-traveled road. Appellants claim that *Seaway* is distinguishable because the easement there was well-defined, being situated between the water and the dune line. They allege that when Alicia destroyed the dunes, it destroyed the well-defined and well-traveled road. They claim that the public's use since Alicia is "a helter-skelter meandering over an unenclosed area which is presumptively permissive." Citing *O'Connor v. Gragg*, 161 Tex. 273, 279, 339 S.W.2d 878, 882 (1960), appellants argue that there is no showing in this case that the area in question was generally or customarily used and that the public use was not so ancient as to be shrouded in obscurity.

The evidence shows a public use of West Beach since before Texas gained its independence from Mexico. There is an abundance of evidence showing that the public customarily used the beach from this time to the present.

Furthermore, we disagree with appellants' argument that the easement is not well-defined. Every witness testified that the public's use was from the water to the vegetation line, wherever the vegetation line was located.

> We think the evidence shows, as we have above detailed, the whole of the beach from the line of mean low tide to the sand dunes has been used for actual travel and in between the dunes to the vegetation line has been used in connection with travel such as for parking vehicles and for camping and in connection with fishing and swimming done by those who traveled. As above noticed, this has not been a desultory use as is the case in those cases relied on by appellant. It has not been a use across an open prairie where one travels helter-

skelter. Nor has it been travel where for some time one travels on a given route and later travels another route distantly removed from the first route. The physical nature of the beach and the use made definitely define the route. The line of vegetation and the line of low tide mark the route. Since the high tides are daily throughout the year, it means that anyone making use of the beach at high tide must use that part near the vegetation line. Evidence shows daily systematic use of the whole area. This requirement of a definite route is required so that the owner may have notice of not only the fact of the adverse claim, but the extent of it. The nature of the terrain and the use made gave sufficient notice to the owner of the extent and location of the route claimed.

*Seaway Co. v. Attorney General*, 375 S.W.2d at 939.

We find more than sufficient evidence to support an easement based on implied dedication. Furthermore, we interpret the cases cited in the rolling easement discussion to hold that an easement established by dedication can shift. *See Barney v. City of Keokuk*, 94 U.S. (4 Otto) 324, 24 L.Ed. 224 (1876); *Godfrey v. City of Alton*, 12 Ill. 29 (1850). Once an easement is established, it encompasses whatever land is absolutely necessary to effectuate the purposes of the easement. *Nonken v. Bexar County*, 221 S.W.2d 370, 374 (Tex.Civ. App.—Eastland 1949, writ ref'd n.r.e.).

Because we find that the public established an easement based on implied dedication, it is unnecessary for us to discuss Appellants' complaint that the court erred in finding an easement based on custom and prescriptive use. We do note, however, that there was evidence to support these findings. *See e.g., Matcha v. Mattox*, 711 S.W.2d 95 (Tex.App.—Austin, 1986); *Villa Nova Resort, Inc. v. Texas*, 711 S.W.2d 120 (Tex.App.—Corpus Christi, 1986); *Seaway Co. v. Attorney General*, 375 S.W.2d at 935–939; *State ex rel Thornton v. Hay*, 254 Or. 584, 462 P.2d 671, 677

(1969). Points of error five through eight are overruled.

## IV. OBLITERATED VEGETATION LINE

Appellants' fourth area of contention is that the trial court erred in concluding that the line of vegetation on West Beach is dynamic and that it moved in a landward direction after Alicia. They argue that the State Legislature *assumed* in the Act that the vegetation line is stable, that it corresponds with the reach of the Gulf's highest waves, and that it should not be affected by extraordinary weather such as hurricanes. Appellants contend that the statute contemplates a vegetation line that corresponds to the dune line, and "serves as a relatively permanent monument unless obliterated by human activities or natural forces." When the "monument" has been obliterated by a storm, the line is to be reconstructed in accordance with section 61.016 of the Act.

Appellants do not dispute that Alicia caused a landward movement in the visible vegetation line. Their witnesses, as well as the State's, agreed that the vegetation line moved in a landward direction 60 to 100 feet after Alicia. Instead, they argue that when the vegetation line recedes because of extraordinary weather, the post-storm vegetation line should be determined by the methods set out in the Act. The question presented to us is whether the vegetation line on West Beach was obliterated as that term is used in sections 61.016 and 61.017 of the Act.

"Line of vegetation" is defined as "the extreme seaward boundary of natural vegetation which spreads continuously inland." sec. 61.001(2) (Vernon 1978). Sections 61.-016 and 61.017 of the Act explain how to locate the vegetation line where there is no clearly marked vegetation line or where the vegetation line is obliterated or created ar-

tificially.[3] "Obliterate" is not given a definition in the Act, but is defined in Webster's as "to destroy utterly all traces, indications, significance of." Webster's Third Int'l Dictionary 1557 (1976 ed.) Consequently, for this Court to hold that the vegetation line was obliterated, there would have to be no trace of a line of vegetation. To reach this conclusion would contradict the testimony presented at trial.

■ Most of the witnesses who testified agreed that there is a vegetation line on the beaches and that it moved in a landward direction because of Alicia. What they disagreed on was how much of its previous position it would regain. One of appellants' expert witnesses testified at length about the location of the post-Alicia vegetation line, and another testified about the current location of the line and whether it would return to its pre-Alicia position. One of the State's expert witnesses testified at length about the erosion of West Beach in general, and of the line of vegetation in particular. Finally, the testimony of the supervisor of a crew hired by the City of Galveston Parks Board to clean trash accumulated on the beach between the water and the vegetation line echoed the experts' testimony that there is an easily identifiable post-Alicia vegetation line. The above testimony is some evidence to support the trial court's conclusion that the line of vegetation is dynamic and that it merely moved landward after Alicia rather than being obliterated.

Appellants' second point of error is overruled.

## V. EROSION VERSUS AVULSION

Appellants' next point of error pertains to the trial court's conclusion of law that Hurricane Alicia's effect on the vegetation line at West Beach constituted an erosion of the shore line rather than an avulsion.

---

**3.** If there is no clearly marked vegetation line, reference shall be made to the two points bordering the unmarked area at which vegetation begins to grow again. If the location of the vegetation line of the bordering areas is uneven, the "line of vegetation" for the area that has no

clearly marked vegetation line shall be the average elevation of the two bordering sides. Sec. 61.016(c). The procedure spelled out in section 61.016 also applies if the line of vegetation is obliterated or created artificially.

We consider this conclusion of law to be immaterial to our decision, because the only questions presented in this appeal relate to the State's claimed easement under the Open Beaches Act. The underlying title of the appellant property owners is not in issue. Thus, we need not discuss whether the property owners' title was lost through an erosive process, or whether the effect of Hurricane Alicia was avulsive in nature. For this reason, we express no opinion as to the conclusion reached by one intermediate appellate court, that a loss of tidal shoreline by hurricane action should be treated as an erosive process. *See City of Corpus Christi v. Davis*, 622 S.W.2d 640, 646 (Tex.App.—Corpus Christi 1981, no writ). Neither need we consider whether the property owners should be afforded a reasonable opportunity to reclaim their lands by artificial means. *See Coastal Industrial Water Authority v. York*, 532 S.W.2d at 952, citing *Fitzgerald v. Boyles*, 66 S.W.2d 347 (Tex.Civ.App.1933, writ dism'd), and *Fisher v. Barber*, 21 S.W.2d 569 (Tex.Civ.App.1929, no writ). We, therefore, do not decide whether the effects of Hurricane Alicia were avulsive in nature, and if so, what effect such avulsive loss might have upon the title of the property owners.

### VI. IS THE ROLLING EASEMENT CONSTITUTIONAL?

 In their final two points of error, Appellants dispute the constitutionality of the rolling easement theory. They claim first that the rolling easement theory deprives them of their due process of law and due course of law of the land and finally that the rolling easement theory deprives them of their rights under the equal protection clause of the 14th Amendment to the United States Constitution. Appellants raised neither of these issues in the trial court. They are not contained in their pleadings, not addressed in the findings of fact and conclusions of law of the court, and not addressed in the judgment. A party to a lawsuit waives the right to raise a constitutional claim on appeal if that claim is not raised in the trial court. *See*

*Phillips v. Sharpstown General Hospital*, 664 S.W.2d 162, 169 (Tex.App.—Houston [1st Dist.] 1983, no writ); *Reddix v. Eaton Corp.*, 662 S.W.2d 720, 723 (Tex.App.—San Antonio 1983, writ ref'd n.r.e.); *Ybarra v. Saldana*, 624 S.W.2d 948, 952 (Tex.App.—San Antonio 1981, no writ).

Appellants' points of error 10 and 11 are overruled.

For the foregoing reasons, this Court affirms the judgment of the trial court.