2006 VT 28

**Town of South Hero v. James Wood, David Fifield, Joyce Fifield, Hal Woods, Stephanie Woods and Harlow Frechette, Jr.**

[898 A.2d 756]

No. 04-387

Present: **Reiber, C.J., Johnson, Skoglund and Burgess, JJ., and Allen, C.J. (Ret.), Specially Assigned**

Opinion Filed April 7, 2006

418

*Paul S. Gillies* of *Tarrant, Marks & Gillies*, Montpelier, for Plaintiff-Appellee/Cross-Appellant.

*Roger E. Kohn* of *Kohn & Rath, LLP*, Hinesburg, for Defendants-Appellants/Counterclaim Plaintiffs-Appellants.

¶ 1. **Skoglund, J.** This case turns on the ever-changing location of East Shore Road, a town road that runs along Knee Deep Bay in South Hero, Vermont. Over time, Lake Champlain has eroded the shoreline, and plaintiff Town of South Hero has responded by moving

the road further inland onto defendants' land. In 2000, the Town sought a declaratory judgment as to the existence, location, and width of the road, and defendants — the four landowners on whose properties the Town claims the right-of-way for the road is located — counterclaimed for damages and injunctive relief. The trial court held that a right-of-way for the road was created by dedication and acceptance of the changes in the road's position until a time just prior to the maintenance work the Town did in August of 2000, and that any road work by the Town outside of that right-of-way was a taking. As explained below, we affirm the trial court's determination of the location and width of the right-of-way.

¶ 2. The roots of this dispute, now submerged in the waters of Knee Deep Bay, go back much further than the filing of this action. Maps dating back to 1819 depict a road running along the shore of the bay, and, although there has never been a formal laying-out of the road, the parties acknowledge its "historical existence." The court used a 1942 aerial photo to fix the original position of the road — now eighty or more feet offshore — finding it "more likely than not that the 1942 center line of the road has long been the center line of the subject road . . . as it was historically dedicated by use." The court then determined the location of the road in 1962, and the parties appear to agree that the Town's movement of the road to that location was proper. The question here is the legal significance of the road's post-1962 migrations. We must determine whether, as the Town contends, the right-of-way for the road continuously moves along with the incremental changes resulting from erosion and maintenance of the roadway, or, as defendants argue, it remains fixed at its 1962 position.

¶ 3. The evidence reflects that East Shore Road, while not a heavily-trafficked thoroughfare, was regularly used as a road for decades. Charles Tourville, a seventy-two-year resident of South Hero, and John Roy, a sixty-two-year resident, both testified that they used the road since they were boys. Robert Frechette, the brother of two of the defendants, testified that he drove on the road "a couple times a year." In addition to the trial testimony, the record includes sworn statements made by a number of residents in October 2000. Those statements demonstrate that people have driven on the road for many decades, and continued to do so up until 2000.

¶ 4. Over the years, as the north shore of the bay continuously eroded, the Town maintained the road by adding material and cutting trees as needed. The road is seasonal; over the years, the

Town has plowed it sporadically during the winter, and it has been underwater and thus impassable in the spring. At trial, Mr. Tourville testified that the Town opened the road every year from 1966 to 1988 (his entire tenure as road commissioner), and Mr. Roy, who became road commissioner in 1990, testified that the Town opened the road in the years other than 1996 through 1999.[1]

¶ 5. In 2000, the Town indicated that it was going to perform significant maintenance work on the road that would encroach upon defendants' property. On August 21, 2000, defendants' attorney sent a letter to the Town objecting to the proposed construction. Four days later, the Town filed the declaratory judgment complaint that began this case. On August 28, 2000, three days after filing the lawsuit, the Town began the construction work, which it completed in September 2000. The construction work moved the road further inland, placing most of it between 100 and 160 feet further inland from its 1942 location, and more than twenty-five feet inland from its 1962 location.

¶ 6. In September 2000, defendants counterclaimed for damages and injunctive relief. Based on the parties' stipulation, the trial court bifurcated the question of the road's location from the issues of damages and attorneys' fees. In 2003, the court held a bench trial to determine the location of the right-of-way for the road. It held that "[t]he right-of-way for the road was created by dedication and acceptance," and described the right-of-way as "three rods wide, one and one half each side of the center line of the traveled portion as it moved slightly up to 2000." In other words, the court used the 1962 location of the road as its starting point, and held that the right-of-way included the changes made by the Town "as dedicated and accepted over the years until 2000."[2] The court based its conclusion that defendants dedicated the land on their "[l]ong acquiescence in use by the public and allowance by the owners of repairs at public expense."

¶ 7. The court rejected the Town's "shifting highway" and "rolling easement" theories and held that "[p]art of the 2000 construction by the Town is outside of the right-of-way and constitutes a wrongful

---

[1] There was no specific testimony about the road's status in 1989 because Mr. Tourville's tenure as road commissioner ended in 1988, and Roy's began in 1990.

[2] The partial judgment order signed by the court on August 4, 2004 confirms that the "centerline of the road is hereby declared to be the centerline of the road as it existed prior to the construction work done by the Town in 2000. The width of the road is hereby declared to be three rods wide, centered on said centerline."

taking." It pointed out that the Town "must proceed to follow statutory procedures if parts of the new roadway are to remain as constructed in 2000" and to pay damages for property taken outside the right-of-way. The court then issued a final partial judgment defining the location and width of the right-of-way, permanently enjoining the Town from doing any further road work on defendants' land lying outside the right-of-way, and setting for trial the parties' remaining claims for damages, liability under 42 U.S.C. § 1983, and attorneys' fees. Defendants appealed, and the Town cross-appealed. We address defendants' appeal in Section I and the Town's cross-appeal in Section II.

## I.

¶ 8. Defendants argue that the court erred in concluding that the right-of-way had moved by dedication and acceptance farther inland from the 1962 location of the road. Specifically, they contend that the evidence at trial precluded the court from ruling that they intended to dedicate any land outside the 1962 roadway for public use, pointing to trial testimony describing four discrete incidents. First, Harlow Frechette, Sr., their predecessor-in-title, twice during the 1960s put up barriers to attempt to stop people from using the road, both of which the Town removed. Second, in the mid-1970s, defendant David Fifield encountered Charles Tourville, then the road commissioner of South Hero, operating a grader on East Shore Road. Mr. Fifield testified that he asked Mr. Tourville what he was doing. When asked at trial if he did anything other than ask Mr. Tourville what he was doing, Mr. Fifield responded, "No. It was quite evident that it wouldn't make any difference. He was not the person to pursue the complaint with." Third, Mr. Fifield testified that in 1991 he walked the beach with road commissioner John Roy and complained about the road, pointing out cut trees that had been "dumped well beyond a 50-foot right-of-way." Fourth, the minutes of the Town selectboard reflect that the Frechettes and Fifields attended an August 5, 1991 meeting "to discuss the road being built up in front of their camps" and expressed concern about the removal of trees and about the public's use of the beach without asking permission of the landowners.

¶ 9. In response, the Town argues that the court correctly concluded that defendants' evidence of their unwillingness to dedicate the roadway is outweighed by the evidence showing intent to dedicate — namely, defendants' long acquiescence in the existence of

the road and acceptance of the Town's efforts to maintain it. We agree.

■ ¶ 10. "Dedication is the setting apart of land for public use, either expressly or by implication of law." *Druke v. Town of Newfane*, 137 Vt. 571, 574, 409 A.2d 994, 995 (1979). Dedication of a roadway requires both an offer to dedicate the land and an acceptance of that offer. *Smith v. Town of Derby*, 170 Vt. 553, 554, 742 A.2d 757, 759 (1999) (mem.). In determining whether there has been a dedication and acceptance, "[i]ntent is a question of fact" that we review for clear error. *Id.* (quotations omitted). Accordingly, we will uphold the trial court's determination that defendants intended to dedicate land for the road "unless, taking the evidence in the light most favorable to the prevailing party, and excluding the effect of modifying evidence, there is no reasonable or credible evidence to support [it]." *Mann v. Levin*, 2004 VT 100, ¶ 17, 177 Vt. 261, 861 A.2d 1138.

■ ¶ 11. Because dedication may be express or implied, the offer to dedicate need not come in the form of a writing or an affirmative act by the owner. *Druke*, 137 Vt. at 574, 409 A.2d at 995. For example,

> [l]ong acquiescence in use[] by the public, if the attending circumstances clearly indicate an intent by the owner to devote the land to public use, is evidence upon which a dedication may be predicated. The allowance by the owners of repairs at public expense is one circumstance that strongly tends to show the intent to dedicate.

*Id.* at 575, 409 A.2d at 996 (citations omitted). This follows because the "theory underlying dedication is that owner-permitted use of private property by the public creates . . . an expectation of continued use that estops the owner from preventing it." *Town of Newfane v. Walker*, 161 Vt. 222, 226, 637 A.2d 1074, 1076 (1993); see also *Druke*, 137 Vt. at 576, 409 A.2d at 996 ("[D]edication is actually a form of estoppel in pais, in which the offer by the owner is the representation, and the use by the public is the reliance that completes the estoppel."). Thus, in the context of an implied dedication, the public's use of the land or resource in question looms large. See *Walker*, 161 Vt. at 226, 637 A.2d at 1076 (noting that "[u]se, not ownership, is the crux of dedication").

■ ¶ 12. As described above, the court had before it some evidence that tended to disprove an intent on defendants' part to dedicate land

beyond the 1962 location of the road, including testimony about a handful of instances where defendants expressed concern about the road[3] and one or two instances of defendants' predecessor-in-title erecting a physical barrier across the road. The court concluded, however, that defendants made an implicit offer to dedicate the land, citing the "[l]ong acquiescence in use by the public and allowance by the owners of repairs at public expense" and the fact that "the parties acknowledge the historical existence of the road." Each of these facts was supported by "reasonable or credible evidence." *Mann*, 2004 VT 100, ¶ 17. In effect, the court weighed the conflicting evidence on this issue and decided that the evidence supporting an implied dedication outweighed the evidence against it, a determination well within its province as trier of fact. Therefore, we hold that the court's weighing of the evidence on this issue was not error, and we affirm its conclusion that defendants impliedly dedicated a right-of-way for the road encompassing the road's movements up to August 2000.

¶ 13. The court correctly decided, based on the circumstances leading up to the road work, that the date of the August 2000 construction was the endpoint of the dedication. First, defendants not only "vocally objected" after the Town indicated its intent to do the maintenance work, they also voiced their objections in writing in the August 21, 2000 letter to the selectboard. Within days of receipt of that letter, the Town commenced this action, which put the question of the location of the right-of-way for East Shore Drive squarely in issue. In light of those circumstances, the court's implicit conclusion that defendants' intent to dedicate additional land could no longer be implied was proper.

¶ 14. Defendants next argue that if we uphold the trial court's conclusion that a dedication occurred, then the resulting right-of-way's inland boundary should be the "northerly line of the traveled portion of the road as it existed prior to the August 2000 construction." This argument challenges the trial court's conclusion that the "right-of-way is three rods wide, one and one half each side of the center line of the traveled portion as it moved slightly up to 2000." Defendants' argument would effectively characterize all of the 2000

---

[3] In this regard, we note that defendants' own testimony indicates that to the extent they voiced displeasure about the road's existence, they did not do so in a manner that could have overridden the public's expectation, based on long-time use, that the road was and would remain a public way.

construction as a taking, rather than only that portion of the construction that extends beyond the three-rod right-of-way fixed by the trial court.

¶ 15. When, as here, the boundaries of a road are not properly recorded,[4] the law presumes a roadway width of "one and one half rods on each side of the center of the *existing* traveled way." 19 V.S.A. § 32 (emphasis added). This presumption applies regardless of whether the existing traveled way has wandered from its original route. *Town of Ludlow v. Watson*, 153 Vt. 437, 441, 571 A.2d 67, 69 (1990). Thus, 19 V.S.A. § 32 creates a rebuttable presumption that East Shore Road extends one-and-one-half rods from the centerline of the traveled way as it existed prior to the 2000 construction. See *Watson*, 153 Vt. at 440, 571 A.2d at 69 (interpreting the statute as "an evidentiary method of proving the boundaries of a public highway otherwise incapable of ascertainment from public records" (quotations omitted)). Defendants argue that they have rebutted the presumption because there was no evidence that they "intended to dedicate any land farther inland than the northerly edge of the road" as it existed prior to the 2000 maintenance.

¶ 16. The evidence shows instead that the land was dedicated to public use as a road. Dedication "passes an easement to use the property in a manner consistent with the dedication." *Walker*, 161 Vt. at 226, 637 A.2d at 1076. Thus, because the dedication was based in part on the public's long use of the land *as a road*, the scope of the dedication necessarily included the public's interest in the right-of-way, in addition to the portion actually traveled. This interpretation is supported by the deeds held by defendants, which state that the lands conveyed are subject to the road and its right-of-way.[5] Similarly, the dedication was based in part on defendants' long acquiescence in the Town's maintenance of the road as a town

---

[4] Under 19 V.S.A. § 702, "[t]he right-of-way for each highway and trail shall be three rods wide unless otherwise properly recorded." The trial court found that "[t]here has never been any formal laying out nor formal alteration or relocation of the highway in the Knee Deep Bay area."

[5] The 1999 deed of James Wood states that "[t]he parcel of land herein conveyed is subject to whatever rights the Town of South Hero may have in and to Hochelaga Road, so-called, which crosses the parcel." Similarly, the 1997 deed of Harold Woods and Stephanie Woods notes that the "conveyed land is subject to the right of way of Hochelaga Road (formerly known as East Shore Road)."

highway. Thus, the town should be entitled to rely upon the three-rod presumption when maintaining roads in the absence of evidence to the contrary. Accordingly, we affirm the trial court's ruling as to the location and width of the road.

## II.

¶ 17. In its cross-appeal, the Town argues that there can be no taking in this case because the shoreline is "the only true monument" for determining the location of the road and the Town has respected that location "for as long as the road has been there." The Town reasons that it is entitled to a three-rod right-of-way centered at the centerline of the existing traveled way — wherever it may be — because 19 V.S.A. § 32 applies "whether or not the traveled way has changed over time." *Watson*, 153 Vt. at 441, 571 A.2d at 69. According to the Town's interpretation of § 32, "[s]mall changes in boundaries or lines should not require continuing recondemnation. . . . For gradual changes, . . . the presumption acknowledged by *Town of Ludlow v. Watson* is the better policy." In essence, the Town asks this Court to create a "rolling easement" for East Shore Road that moves with the eroding shoreline. Therefore, the Town contends, there is no taking because, even after the 2000 construction, "the newly-constructed highway is within the presumed right-of-way."

¶ 18. We disagree with the Town's analysis. A "common-law dedication . . . does not pass fee simple; rather, it passes an easement to use the property in a manner consistent with the dedication." *Walker*, 161 Vt. at 226, 637 A.2d at 1076. Thus, the implied dedication discussed above resulted in the Town acquiring an easement to use the land occupied by the traveled way as it existed prior to the August 2000 construction and nothing more. The Town cannot justify further inland relocations of the road by successive applications of § 32's three-rod presumption because doing so would amount to a unilateral change in the location of the easement without the consent of defendants, the owners of the servient estates. See *In re Shantee Point, Inc.*, 174 Vt. 248, 261, 811 A.2d 1243, 1254 (2002) (recognizing that once an easement is fixed, it cannot be unilaterally enlarged or relocated by the owner of the dominant estate without consent of the owner of the servient estate). Accordingly, we reject the Town's argument that § 32 allows it to undertake "gradual changes" that move the road beyond the inland boundary established by the dedication without compensating defendants. To hold otherwise would enable the Town to rebuild the road within, but at the far

inland edge of, the current right-of-way, and then apply § 32 to "slide" the right-of-way inland by centering it at the centerline of the new traveled way — a process which, in theory, could continue indefinitely.

¶ 19. The Town's reliance on *Feinman v. State*, 717 S.W.2d 106 (Tex. App. 1986), is misplaced. There, the Texas Court of Appeals held that a statute that pegged the location of a public beach easement to the vegetation line of a beach created a rolling easement that moved up or back as the vegetation line changed. 717 S.W.2d at 110-11. The statute defined the "'line of vegetation'" as "'the extreme seaward boundary of natural vegetation which spreads continuously inland'" and the public beach as "'extending inland from the line of mean low tide to the line of vegetation.'" *Id.* at 107 n.2, 109 (quoting Tex. Nat. Res. Code Ann. § 61.001(2) (Vernon 1978)). The court concluded that "the vegetation line is not stationary and that a rolling easement is implicit in the Act," noting that a "rigid construction" requiring the public to prove that it has an easement to the vegetation line every time the line changes "would defeat the purposes of the Act." *Id.* at 111. Thus, *Feinman* turned on the wording and purpose of the Texas statute. Given the absence of an analogous Vermont statute, *Feinman* does not support the adoption of a "rolling easement" theory in this case.

¶ 20. Finally, the Town contends that, after the August 2000 construction, the road remained completely inside the three-rod right-of-way centered on the centerline of the preconstruction traveled way created by the dedication. In so arguing, the Town refers to defendants' trial exhibit C, a large map that depicts the location of the traveled way prior to the construction, the traveled way after the construction, and the boundaries of the three-rod right-of-way centered at the centerline of the preconstruction traveled way. While we decline to rule on whether and to what extent the August 2000 construction worked a taking, we note that, contrary to the Town's contention, defendants' exhibit C appears to shows several small areas where the post-construction traveled way sits outside of the three-rod right-of-way. Pursuant to the parties' stipulation, the trial court will determine during the second phase of this bifurcated matter whether the August 2000 construction was a taking of defendants' land and, if so, to what extent.

¶ 21. In conclusion, the trial court correctly decided that the right-of-way for East Shore Road as it existed prior to the August 2000 construction work was established by dedication and acceptance of

the incremental changes in the roadway's location up to that time. Additionally, the court applied 19 V.S.A. § 32 properly in centering the right-of-way at the centerline of the traveled way, rather than setting the inland edge of the traveled way as the right-of-way's boundary. The court also correctly rejected the Town's theories that would have the effect of moving the right-of-way further inland from that location. Therefore, we affirm the partial judgment and remand the matter so that the second phase of the litigation can proceed.

*Affirmed and remanded for further proceedings consistent with this decision.*