WIENER, Circuit Judge,
dissenting:
■ With genuine regard and respect for my colleagues of the panel majority, I must dissent.
I. CONTEXT
Although undoubtedly unintentionally, the panel majority today aids and abets the quixotic adventure of a California resident who is here represented, by counsel furnished gratis by the Pacific Legal Foundation. (That non-profit’s published mission statement declares that its raison d’étre includes “defending] the fundamental human right of private property,” noting that such defense is part of each generation’s obligation to -guard “against government encroachment.”) The real alignment between Severance and the Pacific Legal Foundation is not discernable from the record on appeal, but the real object of these Californians’ Cervantian tilting at Texas’s Open Beaches Act (“OBA”) is clearly not to obtain reasonable compensation for a taking of properties either actually or nominally purchased by Severance, but is to eviscerate the OBA, precisely the kind of legislation that, by its own declaration, the Foundation targets. And it matters not whether Ms. Severance’s role in this litigation is genuinely that of the fair Dulcinea whose distress the Foundation cum knight errant would alleviate or, instead, is truly that of squire Sancho Panza assisting the Foundation cum Don Quixote to achieve its goal: Either way, the panel majority’s reversal of the district court (whose rulings against Severance I would affirm) has the unintentional effect of enlisting the federal courts and, via certification, the Supreme Court of Texas, as unwitting foot-soldiers in this thinly veiled Libertarian crusade. It is within this framework that I shall seek to demonstrate how the panel majority misses the mark and why *505 Severance’s action should be dismissed, once and for all, for her lack of standing to assert either a Fifth Amendment takings claim for reasonable compensation (because Severance has had nothing taken by the State) or a Fourth Amendment unreasonable seizure claim (because that which was putatively seized did not belong to Severance at the time; and even if it had, there was nothing unreasonable about the purported seizure).[1]
II. OVERVIEW
The panel majority unnecessarily approbates a new avenue of attack against the State’s power of eminent domain; for not only is the analysis in today’s majority opinion fundamentally flawed, but the panel majority needlessly takes on a question of constitutional significance despite the availability of prudential grounds on which to decide this appeal. At bottom, there is but one easement, albeit one whose boundaries could shift and have shifted. Thus, if there ever was a taking, there was but one — and it occurred long before Severance acquired title to the properties. Refusing to accept this truism, the majority opinion proceeds to misinterpret both the Texas statute at issue and Texas case law. As a result, it incorrectly holds that Severance has standing to assert her takings claim, when and if it should ever ripen, as well as her putative seizure claim. Compounding that error, the majority blurs the boundaries and conflates the elements of a Fourth Amendment seizure claim and those of a Fifth Amendment takings claim, then ignores our precedent and prolongs this meritless litigation by unnecessarily certifying questions to the Texas Supreme Court. I can concur in neither the reasoning of the majority opinion nor its outcome, which permits Severance to seek a benefit based on prior state action to which she has not only acceded and thereby forfeited or waived any related claim, but for which she has presumably been remunerated through an intrinsic diminution in the purchase price that she paid when she bought the already burdened beachfront land.
III. FIFTH AMENDMENT TAKINGS CLAIM
In the half century since the Texas Legislature enacted the OBA in 1959, the State has recognized the public’s ability to acquire — through prescription, dedication or retained right — an easement over portions of the dry beach, whether or not privately owned, along the Texas Gulf Coast. And, it is undisputed that the public acquired such an easement over the beach on which sit properties subsequently acquired by Severance. The OBA states in relevant part:
(a) It is declared and affirmed to be the public policy of this state that the public, individually and collectively, shall have the free and unrestricted right of ingress and egress to and from the state-owned beaches bordering on the seaward shore of the Gulf of Mexico, or if the public has acquired a right of use or easement to or over an area by prescription, dedication, or has retained a right by virtue of continuous right in the public, the public shall have the free and unrestricted right of ingress and egress to the larger area extending from the line of mean low tide to the line of *506 vegetation bordering on the Gulf of Mexico.[2]
The language makes clear (and any doubt that might have lingered has been removed by later legislation and the consistent holdings of the Texas intermediate appellate courts) that the landward border of this easement is not and cannot be permanently fixed.[3] That boundary is identified as the “line of vegetation,” which, given the vagaries of nature, will always be in a state of intermittent flux.
The practical and legal effect of this shifting boundary is that there is and remains only a single easement of public access to the beach. Shifts in the vegetation line do not create new easements; rather they expand (or, in the case of seaward shifts, reduce) the size and reach of that one dynamic easement. To construe the vegetation line as ever having been a fixed point ignores (1) the plainest interpretation of the unambiguous statutory language, (2) later legislation that reasserts this principle,[4] (3) the ease with which the Texas Legislature could have, had it wanted to, fixed the easement’s boundary permanently by specifying a fixed date at which to set the line, (4) interpretations of the Texas courts,[5] and (5) our own prior acknowledgment of this phenomenon.[6] Despite all of this, the ma *507 jority declares that with each shift of the vegetation line, a newr easement is born. I cannot agree. There is and always has been one and only one easement; and that easement already encumbered the entirety of Severance’s land at the time she bought it, even though the easement’s maximum effect and coverage remained inchoate while the vegetation line lay seaward of her property.[7]
Severance has conceded that the easement was established over the dry beach on which her property sits prior to her purchase. But even if she had not, that fact is beyond debate: (1) The property was identified for condemnation as early as 1999 because it had encroached on the dry beach some six years before her purchase, (2) she had to sign a statement when she took title to the land acknowledging the easement and its full potential effect,[8] and (3) at least one Texas court had found there to be an easement across that exact stretch of beach pursuant to the OBA.[9] Severance cannot dispute that when she bought the land, she did not acquire any right to exclude the public from any portion that is dry beach. Although she could exclude the public from those parts of her properties that at any given time lay. landward of the vegetation line, she could do so only until that line shifted further inland.[10]
I agree' with the majority that the property right at issue here is the “right to exclude” members of the public from the dry beach portion of Severance’s land. But Severance never owned this right,[11] so she obviously cannot now claim that what she never owned has been taken from her. The State had taken this “stick” from the bundle of rights comprising ownership of the land long before Severance ever acquired title to the properties.[12] Severance’s legal right to exclude the public from her land pertained only until the vegetation line shifted landward; the Hurricane Rita-related shift merely gave a new footprint to a taking that had occurred long before her ownership commenced.[13]
*508 The majority’s approach perceives the birth of a brand new easement every time the vegetation line shifts,[14] a result I view as a legal impossibility. The line of vegetation, even though relatively stable perhaps, is always subject to flux, as nature is wont to be.[15] Furthermore, the vegetation line can move either landward or seaward from time to time. The majority’s analysis, which sees the possibility of infinite mini-takings implicit in the statutory language, appears to assume that the. vegetation line moves only landward, for it fails to account for how a property owner may reclaim his land as a result of a seaward shift.[16] Rather than interpreting the plainly worded statute at face value, the majority opts for a more convoluted reading, one that, if accurate, would mire the State in the absurdity of endless litigation over an infinite number of infinitesimal accretions to the dry beach.
Had the Texas Legislature intended such a result, it easily could have fixed the extreme of the landward boundary of the easement. Instead, the State borrowed from the familiar common law approach to property lines expected to fluctuate over time. Were there any remaining doubt as to the result originally intended by the Legislature, the lawmakers put it to rest in 1985 when they passed legislation (the “1985 Act”) mandating that sellers of beachfront property inform buyers of the OBA’s easement.[17] The 1985 Act states: “Structures erected seaward of the vegetation line (or other applicable easement boundary) or that become seaward of the vegetation line as a result of natural processes are subject to a lawsuit by the state of Texas to remove the structures.”[18] The 1985 Act makes pellucid that once an easement on the dry beach is established, its landward boundary may therefore “roll,” including over private property.
A correct determination whether there was one easement or many is the key to the standing analysis in this case. Under the Palazzolo v. Rhode Island physical-taking analysis — which the majority purports to employ — Severance lacks standing to bring a Fifth Amendment claim because any taking occurred prior to her 2005 pur *509 chase of the property.[19] The majority nevertheless reasons that the rule of Palazzolo does not deprive Severance of standing because, when she bought the land, the easement had not attached to the portion of the land that was later affected by Hurricane Rita. As explained above, this simply is not so: Severance’s entire property was encumbered by the easement’s very real potentiality — and predictability— that the vegetation line would shift.[20] Simply put, a pre-existing restriction such as this cannot be a new taking.[21]
In sum, the majority’s flawed multiple-easement analysis infectiously pervades its entire disposition of this case. Severance does not have standing to assert a claim for reasonable compensation under the Fifth Amendment because she has suffered no injury, any taking having occurred before she ever owned the land. The State asserts only a right that it had already acquired. Not only does the panel majority follow this primrose flaw to the erroneous conclusion that Severance has standing; it also relies thereon to conclude that even though Severance’s claim is unripe now, it will ripen in the future, at which point she may return with a valid Fifth Amendment claim. But Severance’s own personal takings claim never was ripe and can never be ripe because the only OBA takings claim related to the land she now owns ripened long before she bought it and was allowed to shrivel on the vine by the one who owned the property at the time the easement took effect on the land. By the time Severance purchased the properties, any takings claim had long since ceased to exist and thus could no longer be acquired by her or anyone else. It would be perverse to allow Severance back into court on her proffered takings claim, now or in the future.
IV. FOURTH AMENDMENT SEIZURE
In permitting Severance’s Fourth Amendment claim to proceed and then *510 putting it on hold by certifying questions about it to the Texas Supreme Court, the majority violates one important aspect of the venerable principle of judicial restraint, viz., deciding a case on constitutional grounds when the same result is available on non-constitutional grounds. Although in my view, the Fourth Amendment is wholly inapplicable to Severance’s claim, we need not and should not reach this question of constitutional magnitude. It is elemental that we must neither “anticipate a question of constitutional law in advance of the necessity of deciding it; [nor] formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied.”[22] In opening the courts’ doors to Fourth Amendment relief for previously frustrated Fifth Amendment takings claimants, the majority today contravenes both of these maxims of limited scope. Its erroneous analysis of the easement, supra, forces it to overlook the obvious conclusion that Severance lacks standing to bring a Fourth Amendment claim, just as she does to bring a Fifth Amendment claim. Additionally, the majority ignores that even if we were to assume arguendo that the Fourth Amendment could somehow provide relief under these circumstances, Severance’s claim would fail on the merits and the district court’s dismissal would have to be affirmed. Ultimately, however, the majority’s Fourth Amendment analysis just goes too far, improperly countenancing the application of the Fourth Amendment in this textbook Fifth Amendment takings case. After all, the Fourth and Fifth amendments are complementary, not duplicative.

A. Standing

As an initial matter that should end all this, Severance’s putative Fourth Amendment seizure claim, like her takings claim under the Fifth Amendment, must be rejected for lack of standing. The Supreme Court in United States v. Jacobsen defined a “seizure” for purposes of the Fourth Amendment as a “meaningful interference with an individual’s possessory interests in his property.”[23] This definition alone is sufficient to defeat Severance’s seizure claim, for there can have been no meaningful interference with a property right that has never belonged to Severance. Unlike her predecessor in title who owned the properties when the public’s easement attached, Severance has never held the “right to exclude” members of the public from any part of her property that constitutes dry beach. Thus the State’s enforcement of the public’s access to the beach does not interfere with or even diminish— does not “seize” — any possessory interest belonging to Severance. Never having had the right to exclude the public from the dry beach, Severance has suffered no injury and thus has no standing — a quintessential example of “no harm, no foul.”

*511
B. Applicability of the Fourth Amendment

We must at all times remain mindful that it is the Fifth Amendment, not the Fourth, that protects an individual’s right to own property while acknowledging the State’s concomitant right to acquire private property, albeit under carefully curtailed conditions: (1) The intended use must be public, and (2) the owner must be justly compensated.[24] “The Takings Clause largely ‘operates as a conditional limitation, permitting the government to do what it wants so long as it pays the charge.’ ”[25] In contrast, the Fourth Amendment protects, inter alia, an individual’s right to possess property that he continues to own.[26] The State may not interfere with possession of private property unless its manner of doing so is reasonable.
Even though some aspects of the Fourth and Fifth amendments might overlap, they provide distinct protections and impose distinct requirements on the government. The seizure clause of the Fourth Amendment protects against unreasonable interference with possession, requiring neither compensation nor public use, while the Takings Clause of the Fifth Amendment protects against physical occupation, transfer of title, and the elimination of all economically beneficial use but does not contain the language of reasonableness. Rather, the Takings Clause implies that if just compensation is paid and the purpose of the taking is public use, then it follows that the taking is reasonable per se.[27] Conversely, the Fourth Amendment requires only reasonableness when the State interferes with possession. The State may justify a seizure as reasonable in a number of ways,[28] nearly all of which have been identified within the criminal justice context — public safety,[29] contraband,[30] border *512 security,[31] public health[32] — but none requires that the State put the property to a particular use or pay the oimer! In essence, the Fourth Amendment provides no compensatory protection to the property owner like Severance, for once the State has satisfied the reasonableness requirement, its obligation is fulfilled. It is the Fifth Amendment, then, construed here through the lens of the Fourteenth Amendment, that ensures that the State must respect private property by curtailing the purpose for which the State may take (be it title, physical possession, or some crucial stick from the bundle of property rights), and requiring that when the State does take, it pay for the privilege. For the majority to say that the Fourth Amendment affords protection when the State takes a stick from the property-rights bundle is tantamount to permitting the State to take without public purpose or without providing just compensation, or both.
Severance’s argument thus leads her to a result that is diametrically opposed to the one she seeks: Less protection of property rights rather than more. In a case like this, in which Severance alleges nothing more than that the reason or purpose of the taking was erroneous, the Fourth Amendment does no “work” for her.[33] As I shall demonstrate in detail below, the State’s action was unquestionably reasonable, leaving Severance uncompensated under the Fourth Amendment for the chimeric loss she now claims. In my judgment, this deftly illustrates why the Fourth Amendment simply does not apply to a takings claim masquerading as a seizure. It offers no quarter, and clearly explains why the Framers added the Fifth Amendment’s Takings Clause, to define— that is, to confine — what is permissible when the State takes private property.[34]
*513 Yet, in countenancing Severance’s Fourth Amendment claim, the majority impermissibly opens the door to judicial cognizance of run-of-the-mill Fifth Amendment takings claims gussied up as seizure claims. Further, in a case like this that will now be heard sequentially to her Fifth Amendment claim (to say nothing of unnecessarily dragging the Texas Supreme Court into the fray), the majority opinion squanders judicial resources. The panel majority permits this takings claimant to don the trappings of a seizure claimant for a second bite at the constitutional apple.
I foresee additional problems, including that this permits Severance and future similar claimants to head off what might otherwise be deemed a valid taking by bringing a seizure claim before the takings claim ripens. Indeed, the State need not act pursuant to an easement to effect a taking. The taking would be valid so long as the intended use was public and the landowner justly compensated. The majority’s holding turns the Fifth Amendment on its head, enabling what might be a valid taking to be an impermissible seizure (the takings claimant has not yet sought compensation so none has been paid), an impossible outcome.

C. Reasonableness

In its rush to conclude that Severance’s Fourth Amendment claim may proceed, the panel majority ignores the obvious, viz., that her claim as pleaded is entirely without merit — a prudential basis of decision that would enable us to avoid the constitutional question altogether. Although Severance claims that she has suffered both a taking and a seizure, all she has really done is to clone her takings claim into a seizure claim. Her sole basis for alleging a violation of the Fourth Amendment’s reasonableness requirement is that, despite all law and evidence to the contrary, the public previously had no right of access to the portion of her property affected by Rita. But this legal conclusion is not talismanic, merely relevant. Fourth Amendment claims are analyzed under a standard of objective reasonableness [35] viewed through the lens of the totality of the circumstances, including the interests at stake.[36] Here, that calculus would entail balancing the interest of the public in continued access to beaches that the people have enjoyed for decades if not centuries, against a private landowner’s interest in excluding members of the public — in the face of a 50-year-old, well-noticed statute, the risk of which Severance acknowledged, accepted, and presumably employed in negotiating her purchase price.[37]
Severance’s seizure claim simply cannot survive this analysis on her sole asserted allegation that the easement had not attached. She does not argue that the State acted in bad faith because she cannot: The Texas courts have repeatedly upheld the *514 statute and recognized its applicability to Severance’s swath of Galveston’s dry beach. At best, she could assert that the State’s assumption that the easement applied was mistaken; yet, as the Supreme Court has recently reminded us, in the context of the Fourth Amendment, mistake alone is insufficient to demonstrate a constitutional violation.[38]
The majority makes much of the Fourth Circuit’s decision in Presley v. City of Charlottesville, the lone circuit ease countenancing simultaneous claims of taking and seizure.[39] But even assuming arguendo that Presley was correctly decided, it is factually distinguishable. Ms. Presley alleged that the City repeatedly encouraged public trespass onto her land by promulgating an erroneous printed trail-map (the trail did not actually cross Presley’s land). When Presley complained, the City repeatedly refused to fix the error and ameliorate the illegal trespassing.[40] Instead, the City passed an ordinance authorizing it to prosecute Presley for defending her property.[41] Presley asserted actions of City misconduct, viz., unreasonableness, that occurred in isolation from — and in addition to — the fact of the taking; Severance alleges no discrete facts that would render Texas’s action unreasonable and distinct from the claimed taking.

D. Consent

Finally, even if Severance were to manage the unlikely feat of demonstrating that the State’s alleged “seizure” was unreasonable, she still could never overcome the fact that she forfeited any such right by consent when she purchased the properties with full and formal knowledge of the rolling easement and its very real potential for rolling. With rare exception, seizures following valid consent are constitutional.[42] By acknowledging and accepting the encumbrance on the properties at the time of her purchase, Severance consented to their effect ad infinitum, waived or forfeited any possible right to contest that encumbrance or to seek payment for it, and even accepted a form of compensation for this diminution in the value of the property by an intrinsic downward adjustment in the purchase price.[43] Her assent validated the encumbrance cum “seizure” the same way that consent to the inspection of one’s vehicle typically validates a search and any ensuing seizure of the vehicle’s contents that might otherwise have been deemed unreasonable.[44] As such, her consent constituted a waiver of the right to complain *515 when the very easement to which she had expressly acceded in her purchase physically rolled further onto her already legally burdened property.
The majority ignores the arguments that counsel against its holding, instead expanding (erroneously) our interpretation of a constitutional provision that need not and should not even be directly addressed. I am convinced that today’s holding needlessly obscures the line between the Fourth and the Fifth Amendments as carefully constructed by the Framers and spuriously opens the Fourth Amendment as an avenue for property-rights activists to attack the exercise of constitutionally permissible powers of eminent domain — a classic example of using a shield as a sword.
V. CERTIFICATION
It is not enough that the majority here countenances an argument that melds the Fourth and Fifth amendments; it then upends our policy on certification in furtherance of this course. Although the decision whether to certify questions to a state supreme court lies within our sound discretion,[45] we must remain chary to exercise that discretion absent a “compelling reason.”[46] The majority’s explanation— that certification is required because the Texas Supreme Court has remained silent on this issue — is insufficient.[47] The Texas intermediate courts are nearly unanimous.[48] And this question is not so complex or difficult a matter of state law that we must refrain from entering the fray— although even if it were, “we do not use certification as a panacea for resolution of complex or difficult state law questions which have not been answered by the highest court of the state.”[49] We should decide the issues before us by affirming the district court’s dismissals on the prudential ground of lack of standing and failure to state a claim without venturing unnecessarily into the Constitutional bog. I respectfully dissent.

. The district court dismissed Severance's action pursuant to Fed. R. Civ. P. 12(b)(6). In my opinion, Severance has no standing to bring her claims whether ripe or not. Nevertheless, were she to be found to have standing, I would affirm the substantive decision of the district court, because she has indeed failed to state any claim on which relief can be granted.

. Tex. Nat. Rbs.Code § 61.011(a) (Vernon 2009) (emphasis added).

. This is not a novel concept. Courts have long recognized that boundaries of property abutting waterways may shift with the movement of the water. See, e.g., Louisiana v. Mississippi, 516 U.S. 22, 25, 116 S.Ct. 290, 133 L.Ed.2d 265 (1995) (referring to the rule of "thalweg,” which holds that a river boundary between states lies along the main downstream navigation channel and "moves as the channel changes with the gradual processes of erosion and accretion”); Georgia v. South Carolina, 497 U.S. 376, 403-04, 110 S.Ct. 2903, 111 L.Ed.2d 309 (1990) ("When the bed is changed by the natural and gradual processes known as erosion and accretion, the boundary follows the varying course of the stream.”); Nebraska v. Iowa, 143 U.S. 359, 360, 12 S.Ct. 396, 36 L.Ed. 186 (1892) ("It is settled law that when grants of land border on running water, and the banks are changed by that [gradual] process known as 'accretion,' the riparian owner's boundary line still remains the stream, although, during the years, by this accretion, the actual area of his possessions may vary”; contrasting "accretion” with "avulsion,” which holds that the boundary does not shift if the water channel shifts course suddenly.). That the line contemplated in the Texas OBA should likewise shift, albeit based on nature’s relocation of the vegetation line rather than a shifting watercourse, is a difference without distinction.

. Act of May 24, 1985, 69th Leg., R.S., ch. 350, § 1, 1985 Tex. Gen. Laws 1419 (codified as Tex. Nat. Res.Code § 61.025 (Vernon 2009)).

. See, e.g., Arrington v. Mattox, 767 S.W.2d 957 (Tex.App.—Austin 1989, writ denied) ("public right of use or easement migrates and moves landward or seaward with the natural movements of the natural line of vegetation and the line of mean low tide”); Feinman v. State, 717 S.W.2d 106, 111 (Tex.App.— Houston[1st Dist.] 1986, writ ref'd n.r.e.) ("we concluded that the vegetation line is not stationary and that a rolling easement is implicit in the Act”); Matcha v. Mattox, 711 S.W.2d 95, 99 (Tex.App.—Austin 1986, writ ref'd n.r.e.) ("Although these boundaries do tend to shift occasionally, they can be determined at any given point in time. The rule has been established that easements may shift from time to time.”); Moody v. White, 593 S.W.2d 372, 379 (Tex.Civ.App.—Corpus Christi 1979, no writ) (same); cf. Seaway Co. v. Attorney General, 375 S.W.2d 923, 939 (Tex.Civ.App.—Houston 1964, writ ref'd n.r.e.) (evidence demonstrates vegetation line has been stable for 200 years and can be easily determined).

. We have twice stated this rule. In Mikeska v. City of Galveston, we said, with reference to the OBA, "[d]ue to shifts of the vegetation line and the erosion of the shoreline, the natural demarcation lines are not static ... the legal boundaries of the public easement change with their physical counterparts.” 451 F.3d 376, 378 (5th Cir.2006) (citing Feinman, 717 *507 S.W.2d at 110-11). And, in Hirtz v. State, we stated that because of the OBA’s definition of the landward boundary of a beach easement as "the line of vegetation” "the location of the easement shifts as the vegetation line shifts.” 974 F.2d 663, 664 (5th Cir.1992).

. Severance appeals only the- disposition of her claims as to the effect of the easement itself on her land qua land. She does not appeal the rulings on her claims as to the condemnation of the improvements on the properties.

. Severance is a real estate broker licensed in Texas; she would have difficulty claiming that she did not know the import of what she was signing.

. Feinman, 717 S.W.2d at 112-13.

. Likewise, the public retains only the right of access until the vegetation line might again roll seaward and off of Severance's property.

. See, e.g., Daniel v. County of Santa Barbara, 288 F.3d 375, 383 (9th Cir.2002) (“Under established federal law, a taking occurs when an option to take an easement is granted, not when the option is exercised.”).

. See, e.g., Kaiser Aetna v. United States, 444 U.S. 164, 176, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979) (a landowner's right to exclude others from his land is "one of the most essential sticks in the bundle of rights that are commonly characterized as property.”). Severance retains title to and dominion over her properly.

. See, e.g., Palazzolo v. Rhode Island, 533 U.S. 606, 628, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001). In Palazzolo, the Supreme Court stated that notice at the time of acquisition does not alone strip a property owner of the ability to contest an easement's effect on his property rights. 533 U.S. at 627-28, 121 S.Ct. 2448. But the easement across Severance’s property is distinct from the land-use restriction in Palazzolo. In that case the effect, if any, of the land-use restriction on the property owner’s rights could not be known *508 until the property owner attempted to develop his land and the governing board, in that case, denied his application. Id. at 614-15, 618-19, 627-28, 121 S.Ct. 2448. In the instant case, the effect of the easement encumbering Severance's property is and always has been clear: She cannot exclude the public from the dry beach portion of her land, an area that shifts over time. She knew the possessory effect of the easement at the time she purchased the properties.

. The majority would bolster its approach by seeing confusion in the Texas case law. But it is the majority that appears to confuse the question of the effect of the easement's “rolling'' boundary with the question of how many easements are at work: Texas courts might disagree about the former, but not about the latter.

. Indeed, this court has considered claims similar to Severance's after previous major storms caused dramatic shifts in the vegetation line along the Texas Gulf Coast. Mikeska v. City of Galveston, 451 F.3d 376, 378 (5th Cir.2006) (Tropical Storm Frances in 1998); Hirtz v. State, 974 F.2d 663, 664 (5th Cir. 1992) (Hurricane Alicia in 1983 and “fierce spring storms” in 1988).

. The panel majority ignores the obvious implication of its holding: If the State must pay for a new taking with each landward shift, surely the property owner must pay reasonable compensation to the State to buy back his right to exclude the public with each seaward shift.

. Act of May 24, 1985, 69th Leg., R.S., ch. 350, § 1, 1985 Tex. Gen. Laws 1419 (codified as Tex. Nat. Res.Code § 61.025 (Vernon 2009)).

. Id. (all capital letters — emphasis removed; emphasis added).

. 533 U.S. 606, 628, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001) (injury occurs at the time the taking is effected). At any rate, Severance did not pay for the property interest, the taking of which would have been reflected in an intrinsic discount on the purchase price, which she, as a willing buyer, paid her willing seller, both being fully informed of the OBA by virtue of the 1985 Act. See infra note 21. She took a calculated risk when she bought the property, paying less in the knowledge that her legal right to exclude the public from the land was limited.

. The litany of storms that have hammered and at times totally inundated Galveston Island, from "Isaac’s Storm” in 1901 through Hurricane Ike in 2008, three years after Rita, leaves no doubt. See, e.g., Erik Larson, Isaac’s Storm (Random House 1999); see also supra note 15.

. Lucas v. S. Car. Coastal Council, 505 U.S. 1003, 1028-29, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992) (severe limitations on land use must “inhere in the title itself,” addressing regulatory taking); see also Daniel v. County of Santa Barbara, 288 F.3d 375, 383 (9th Cir.2002); United States v. 30.54 Acres of Land, 90 F.3d 790, 792 (3d Cir.1996) (preexisting limitation on landowner's title was not a taking when the government chose to exercise its right). Even if I could agree that a property owner might be able to contend that there is a new taking when he could not have known of an easement’s potential effect on his land, Severance can make no such claim. Six years before she bought her properties, the State had condemned them for encroaching on the public beach easement.
Furthermore, Severance has been compensated for the missing "right to exclude” through an intrinsic diminution in her purchase price, and therefore has suffered no injury. Carson Harbor Village Ltd. v. City of Carson, 37 F.3d 468, 476 (9th Cir.1994) ("The price paid for the property presumably reflected the market value of the property minus the interests taken.”), overruled on other grounds by WMX Tech., Inc. v. Miller, 104 F.3d 1133 (9th Cir.1997) (en banc); see also Daniel, 288 F.3d at 383.

. Liverpool, N.Y. & P.S.S. Co. v. Emigration Com’rs, 113 U.S. 33, 39, 5 S.Ct. 352, 28 L.Ed. 899 (1885); see also Greater New Orleans Broad. Ass’n, Inc. v. United States, 527 U.S. 173, 184, 119 S.Ct. 1923, 144 L.Ed.2d 161 (1999) (“It is, however, an established part of our constitutional jurisprudence that we do not ordinarily reach out to make novel or unnecessarily broad pronouncements on constitutional issues when a case can be fully resolved on a narrower ground.”); Wood v. Georgia, 450 U.S. 261, 265-66, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981) (citing Spector Motor Serv., Inc. v. McLaughlin, 323 U.S. 101, 105, 65 S.Ct. 152, 89 L.Ed. 101 (1944)); United States v. Raines, 362 U.S. 17, 21, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960).

. United States v. Jacobsen, 466 U.S. 109, 113, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984) (emphasis added). The majority relies heavily on Jacobsens definition of seizure, yet refuses to see that the case cannot support the majority’s Fourth Amendment-related holding.

. The Takings Clause states: "... nor shall private property be taken for public use, without just compensation.” U.S. Const. amend. V. First English Evangelical Lutheran Church of Glendale v. Los Angeles County, Cal., 482 U.S. 304, 314, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987).

. Kelo v. City of New London, Conn., 545 U.S. 469, 487 n. 19, 125 S.Ct. 2655, 162 L.Ed.2d 439 (2005) (quoting E. Enters. v. Apfel, 524 U.S. 498, 545, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998) (Kennedy, J., concurring in judgment and dissenting in part)). In analyzing the propriety of a taking, the courts are deferential to the "legislative judgments” at issue. Id. at 480, 125 S.Ct. 2655.

. U.S. Const. amend. IV; see also Jacobsen, 466 U.S. at 113, 104 S.Ct. 1652. The Fourth Amendment reads, in relevant part: "The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures....” The Fourth and the Fifth Amendment were made applicable to the states through the Fourteenth Amendment. See, e.g., Kelo, 545 U.S. at 472 n. 1, 125 S.Ct. 2655 (Fifth Amendment); Mapp v. Ohio, 367 U.S. 643, 655, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) (Fourth Amendment).

. First English Evangelical Lutheran Church, 482 U.S. at 314-15, 107 S.Ct. 2378; see also Kelo, 545 U.S. at 489-90, 125 S.Ct. 2655; Kelo, 545 U.S. at 497, 125 S.Ct. 2655 (O'Connor, J., dissenting). This is a trade-off the Framers’ sanctioned. Monongahela Nav. Co. v. United States, 148 U.S. 312, 325, 13 S.Ct. 622, 37 L.Ed. 463 (1893) ("it prevents the public from loading upon one individual more than his just share of the burdens of government”).

. Obviously, the existence of a warrant based on probable cause will be sufficient. U.S. Const, amend. IV.

. Terry v. Ohio, 392 U.S. 1, 20-22, 24, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); see also Gates v. Tex. Dep’t of Protective & Regulatory Servs., 537 F.3d 404, 429 (5th Cir.2008) (exigent circumstances such as imminent danger of physical or sexual abuse may justify seizing a child from his parents without a warrant); United States v. Shannon, 21 F.3d 77, 82 (1994) ("The exigent circumstances that must *512 exist include: hot pursuit of a suspected felon; the possibility that evidence may be removed or destroyed; and danger to the lives of officers or others.”).

. Minnesota v. Dickerson, 508 U.S. 366, 375-76, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993) (“if the object is contraband, its warrantless seizure would be justified by the same practical considerations that inhere in the plain-view context”); Carroll v. United States, 267 U.S. 132, 149, 45 S.Ct. 280, 69 L.Ed. 543 (1925) (search and seizure of vehicle valid if reasonable belief that it contains contraband).

. United States v. Ramsey, 431 U.S. 606, 616, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977) (inspections of persons entering the country are “reasonable simply by virtue of the fact that they occur at the border”).

. Hodel v. Va. Surface Min. & Reclamation Ass'n, Inc., 452 U.S. 264, 300, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981) ("deprivation of property to protect the public health and safety is ‘one of the oldest examples' of permissible summary action”) (quoting Ewing v. Mytinger & Casselberry, Inc., 339 U.S. 594, 599, 70 S.Ct. 870, 94 L.Ed. 1088 (1950)); Norman Bridge Drug Co. v. Banner, 529 F.2d 822, 828 (5th Cir.1976) (seizure without notice can be invoked "only to avoid imminent danger to the public health and safety”).

. The majority protests that this court, as well as others have held, that claims may implicate multiple constitutional protections. See John Corp. v. City of Houston, 214 F.3d 573, 582 (5th Cir.2000) (considering the interplay of the Fifth Amendment and substantive due process). I do not disagree. I contend only that the wrong Severance asserts has been inflicted on her has no remedy in the Fourth Amendment.

. First English Evangelical Lutheran Church of Glendale v. Los Angeles County, Cal., 482 U.S. 304, 314, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987). ("As its language indicates, and as the Court has frequently noted, [the Takings Clause] does not prohibit the taking of private property, but instead places a condition on the exercise of that power.”). As a result, the Takings Clause subsumes the Fourth Amendment protections Severance seeks: We cannot know if a taking is reasonable until we know whether public use and just compensation are satisfied.

. Graham v. Connor, 490 U.S. 386, 388, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).

. See, e.g., Collins v. Ainsworth, 382 F.3d 529, 538 (5th Cir.2004) (quoting Brown v. Texas, 443 U.S. 47, 50-51, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979)).

. Indeed, the Court in Soldal v. Cook County, III., made clear that a claim like Severance’s is unlikely to succeed. 506 U.S. 56, 71, 113 S.Ct. 538, 121 L.Ed.2d 450 (1992). In seeking to allay fears that its holding would open the floodgate to frivolous civil seizure claims — -just as we now face — the Court pointed out that "reasonableness is still the ultimate standard under the Fourth Amendment, ... the reasonableness determination will reflect a careful balancing of governmental and private interests. Assuming, for example, that the officers were acting pursuant to a court orderf] ... a showing of unreasonableness on these facts would be a laborious task indeed." Id. (internal citations omitted).

. Herring v. United States, -U.S.-, 129 S.Ct. 695, 699, 172 L.Ed.2d 496 (2009) ("When a probable-cause determination was based on reasonable but mistaken assumptions, the person subjected to a search or seizure has not necessarily been the victim of a constitutional violation.”); see also Illinois v. Rodriguez, 497 U.S. 177, 185, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990) ("[Sjufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment”).

. Presley v. City of Charlottesville, 464 F.3d 480 (4th Cir.2006).

. Id. at 482.

. Id. at 483.

. United States v. Hernandez-Zuñiga, 215 F.3d 483, 487 (5th Cir.2000) (citing United States v. Woodrum, 202 F.3d 1, 11 (1st Cir.2000)); see also Mason v. Pulliam, 557 F.2d 426, 428 (5th Cir.1977) (relying on Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)).

. United States v. Dow, 357 U.S. 17, 27, 78 S.Ct. 1039, 2 L.Ed.2d 1109 (1958) (discussing contractual and other remedies available to a private party who knowingly purchases encumbered land).

. See, e.g., United States v. Kelley, 981 F.2d 1464, 1470 (5th Cir.1993).

. Compass Bank v. King, Griffin & Adamson P.C., 388 F.3d 504, 505 n. 1 (5th Cir.2004).

. Id. at 505.

. Patterson v. Mobil Oil Corp., 335 F.3d 476, 487 (5th Cir.2003).

. Jefferson v. Lead Inds. Ass’n, Inc., 106 F.3d 1245, 1247 (5th Cir. 1997).

. Id. (“Alone, the absence of a definitive answer from the state supreme court on a particular question is not sufficient to warrant certification.”)