IN THE SUPREME 
COURT OF TEXAS
 
════════════
No. 
09-0387
════════════
 
Carol Severance, 
Petitioner,
 
v.
 
Jerry Patterson, Commissioner 
of the Texas General Land Office; Greg Abbott, attorney General for the State of 
Texas; and Kurt Sistrunk,
District Attorney for the 
County of Galveston, Texas, Respondents
 
════════════════════════════════════════════════════
Certified Question on Appeal 
from the
United States District Court 
for the Southern District of Texas
════════════════════════════════════════════════════
 
 
Argued November 19, 2009
 
            
Justice Wainwright 
delivered the opinion of the Court, in which Justice Hecht, Justice Green, Justice Johnson, 
Justice Willett, and Justice 
Guzman joined.
 
            
Justice Medina delivered a 
dissenting opinion, in which Justice 
Lehrmann joined. 

            
Chief Justice Jefferson did 
not participate in the decision.
 
            
This case comes before us in the form of certified questions from the United 
States Court of Appeals for the Fifth Circuit.  Pursuant to article V, 
section 3-c of the Texas Constitution and Texas Rule of Appellate Procedure 
58.1, we answer the following questions:
 
1.                  
Does Texas recognize a “rolling” public beachfront access easement, 
i.e., an easement in favor of the public that allows access to and use of 
the beaches on the Gulf of Mexico, the boundary of which easement migrates 
solely according to naturally caused changes in the location of the vegetation 
line, without proof of prescription, dedication or customary rights in the 
property so occupied? 
 
2.                  
If Texas recognizes such an easement, is it derived from common law 
doctrines or from a construction of the [Open Beaches Act]?
 
3.                  
To what extent, if any, would a landowner be entitled to receive 
compensation (other than the amount already offered for removal of the houses) 
under Texas’s law or Constitution for the limitations on use of her property 
effected by the landward migration of a rolling easement onto property on which 
no public easement has been found by dedication, prescription, or custom?
 
Severance v. 
Patterson, 566 F.3d 
490, 503–04 (5th Cir. 2009), certified questions accepted, 52 Tex. 
Sup. Ct. J. 741 (May 15, 2009).[1]  The central issue is whether 
private beachfront properties on Galveston Island’s West Beach are impressed 
with a right of public use under Texas law without proof of an 
easement.
            
Oceanfront beaches change every day.  Over time and sometimes rather 
suddenly, they shrink or grow, and the tide and vegetation lines make 
corresponding shifts.  Beachfront property lines retract or extend as 
previously dry lands become submerged by the surf or become dry after being 
submerged.  Accordingly, public easements that burden these properties 
along the sea are also dynamic.  They may shrink or expand gradually with 
the properties they encumber.  Once established, we do not require the 
State to re-establish easements each time boundaries move due to gradual and 
imperceptible changes to the coastal landscape.  However, when a beachfront 
vegetation line is suddenly and dramatically pushed landward by acts of nature, 
an existing public easement on the public beach does not “roll” inland to other 
parts of the parcel or onto a new parcel of land.  Instead, when land and 
the attached easement are swallowed by the Gulf of Mexico in an avulsive event, a new easement must be established by 
sufficient proof to encumber the newly created dry beach bordering the 
ocean.  These public easements may gradually change size and shape as the 
respective Gulf-front properties they burden imperceptibly change, but they do 
not “roll” onto previously unencumbered private beachfront property when avulsive events cause dramatic changes in the 
coastline.
            
Legal encumbrances or reservations on private property titles on West Beach in 
Galveston Island dating from original land grants during the Republic of Texas 
or at the inception of the State of Texas could provide a basis for a public 
easement by custom or reveal inherent restrictions on the titles of the 
privately owned portions of these beaches.  Under Mexican law, which 
governed Texas prior to 1836, colonization of beachfront lands was precluded for 
national defense and commercial purposes without approval of the “federal 
Supreme Executive Power” of Mexico, presumably the Mexican President.  
However, in 1840 the Republic of Texas, as later confirmed by the State of 
Texas, granted private title to West Galveston Island without reservation by the 
State of either title to beachfront property or any public right to use the now 
privately owned beaches.  Public rights to use of privately owned 
property on West Beach in Galveston Island, if such rights existed at that time, 
were extinguished in the land patents by the Republic of Texas to private 
parties.  In some states, background principles of property law governing 
oceanfront property provide a basis for public ownership or use of the 
beachfront property.  Such expansive principles are not extant in the 
origins of Texas.  Indeed, the original transfer by the Republic to private 
parties forecloses the argument that background principles in Texas common law 
provide a basis for impressing the West Beach area with a public easement, 
absent appropriate proof. 
            
The Texas Open Beaches Act (OBA) provides the State with a means of enforcing 
public rights to use of State-owned beaches along the Gulf of Mexico and of 
privately owned beach property along the Gulf of Mexico where an easement is 
established in favor of the public by prescription or dedication, or where a 
right of public use exists “by virtue of continuous right in the public.”  
Tex. Nat. Res. 
Code §§ 61.012, 
.013(a).  When promulgated in 1959, the OBA did not 
purport to create new substantive rights for public easements along Texas’s 
ocean beaches and recognized that mere pronouncements of encumbrances on private 
property rights are improper.  Because we find no right of public use in 
historic grants to private owners on West Beach, the State must comply with 
principles of law to encumber privately owned realty along the West Beach of 
Galveston Island.
I. 
Background
            
In April 2005, Carol Severance purchased three properties on Galveston Island’s 
West Beach. “West Beach” extends from the western edge of Galveston’s seawall 
along the beachfront to the western tip of the island.  One of the 
properties, the Kennedy Drive property, is at issue in this case.[2]  A rental home occupies the 
property.  The parties do not dispute that no easement has ever been 
established on the Kennedy Drive property.  A public easement for use of a 
privately owned parcel seaward of Severance’s Kennedy Drive property preexisted her purchase.  That easement was established 
in a 1975 judgment in the case of John L. Hill, Attorney General v. West 
Beach Encroachment, et al., Cause No. 108,156 in the 122nd District Court, 
Galveston County, Texas.  Five months after Severance’s purchase, Hurricane 
Rita devastated the property subject to the easement and moved the line of 
vegetation landward.  The entirety of the house on Severance’s property is 
now seaward of the vegetation line.  The State claimed a portion of her 
property was located on a public beachfront easement and a portion of her house 
interfered with the public’s use of the dry beach.  When the State sought 
to enforce an easement on her private property pursuant to the OBA, Severance 
sued several State officials in federal district court.  She argued that 
the State, in attempting to enforce a public easement, without proving its 
existence, on property not previously encumbered by an easement, infringed her 
federal constitutional rights and constituted (1) an unreasonable seizure under 
the Fourth Amendment, (2) an unconstitutional taking under the Fifth and 
Fourteenth Amendments, and (3) a violation of her substantive due process rights 
under the Fourteenth Amendment.
            
The State officials filed motions to dismiss on the merits and for lack of 
jurisdiction.  The district court dismissed Severance’s case after 
determining her arguments regarding the constitutionality of a rolling easement 
were “arguably ripe,” but deficient on the merits.  Not presented with the 
information concerning the Republic’s land grant, the court held that, according 
to Texas property law, an easement on a parcel landward of Severance’s property 
pre-existed her ownership of the property and that after an easement to private 
beachfront property had been established between the mean high tide and 
vegetation lines, it “rolls” onto new parcels of realty according to natural 
changes to those boundaries.  Severance v. 
Patterson, 485 F. Supp. 2d 793, 802–04 (S.D. Tex. 2007).  
Severance only appealed her Fourth and Fifth Amendment challenges to the rolling 
easement theory.  On appeal, the United States Court of Appeals for the 
Fifth Circuit determined her Fifth Amendment takings claim was not ripe, but 
certified unsettled questions of state law to this Court to guide its 
determination on her Fourth Amendment unreasonable seizure claim. 
 Severance, 566 F.3d at 500.
A.  
Texas Property Law in Coastal Areas
            
We have not been asked to determine whether a taking would occur if the State 
ordered removal of Severance’s house, although constitutional protections of 
property rights fortify the conclusions we reach.  The certified 
questions require us to address the competing interests between the State’s 
asserted right to a migratory public easement to use privately owned beachfront 
property on Galveston Island’s West Beach and the rights of the private property 
owner to exclude others from her property.  The “law of real property is, 
under [the federal] Constitution, left to the individual states to develop and 
administer.”  Phillips Petrol. Co. v. 
Mississippi, 484 U.S. 469, 484 (1988) (quoting Hughes v. Washington, 
389 U.S. 290, 295 (1967) (Stewart, J., concurring)); Stop the Beach Renourishment, Inc. v. Fla. Dep’t of Envtl. Prot., ___ U.S. ___, 130 S. Ct. 2592, 2612 (2010) 
(“The Takings Clause only protects property rights as they are established under 
state law, not as they might have been established or ought to have been 
established.”); Oregon ex rel. State Land Bd. v. Corvallis Sand & Gravel 
Co., 429 U.S. 363, 377 (1977) (explaining that “subsequent changes in the 
contour of the land, as well as subsequent transfers of the land, are governed 
by the state law” (citation omitted)).
            
Texas has a history of public use of Texas beaches, including on Galveston 
Island’s West Beach.  See, e.g., Matcha v. 
Mattox, 711 S.W.2d 95, 99 (Tex. App.—Austin 
1986, writ ref’d n.r.e.) (holding 
that “[n]o one doubts that proof exists from which the district court could 
conclude that the public acquired an easement over Galveston’s West Beach by 
custom”), cert. denied, 481 U.S. 1024 (1987); Feinman v. State, 717 S.W.2d 106, 113 (Tex. 
App.—Houston [1st Dist.] 1986, writ ref’d n.r.e.) (discussing evidence 
presented at the trial court that showed “public use of West Beach since before 
Texas gained its independence from Mexico”).  These rights of use were 
proven in courtrooms with evidence of public enjoyment of the beaches dating to 
the nineteenth century Republic of Texas.  But that history does not extend 
to use of West Beach properties, recently moved landward of the vegetation line 
by a dramatic event, that before and after the event have been owned by private 
property owners and were not impressed with pre-existing public easements.  
On one hand, the public has an important interest in the enjoyment of Texas’s 
public beaches.  But on the other hand, the right to exclude others from 
privately owned realty is among the most valuable and fundamental of rights 
possessed by private property owners.
1.  
Defining Public Beaches in Texas
            
The Open Beaches Act states the policy of the State of Texas for enjoyment of 
public beaches along the Gulf of Mexico.  The OBA declares the State’s 
public policy to be “free and unrestricted right of ingress and egress” to 
State-owned beaches and to private beach property to which the public “has 
acquired” an easement or other right of use to that property.  Tex. Nat. Res. Code § 61.011(a).  It defines 
public beaches as:
any beach area, whether publicly or privately owned, 
extending inland from the line of mean low tide to the line of vegetation 
bordering on the Gulf of Mexico to which the public has acquired the right of 
use or easement to or over the area by prescription, dedication, presumption, or 
has retained a right by virtue of continuous right in the public since time 
immemorial, as recognized in law and custom.  This definition does not 
include a beach that is not accessible by a public road or public ferry as 
provided in Section 61.021 of this code.
 
Id. § 61.001(8).[3]  Privately owned beaches may be 
included in the definition of public beaches.  Id. The Legislature 
defined public beach by two criteria: physical location and right of use.  
A public beach under the OBA must border on the Gulf of Mexico.  
Id.  The OBA does not specifically refer to inland bodies of 
water.  Along the Gulf, public beaches are located on the ocean shore from 
the line of mean low tide to the line of vegetation, subject to the second 
statutory requirement explained below.  Id.  The area from mean 
low tide to mean high tide is called the “wet beach,” because it is under the 
tidal waters some time during each day.  The area from mean high 
tide to the vegetation line is known as the “dry beach.”
            
The second requirement for a Gulf-shore beach to fall within the definition of 
“public beach” is the public must have a right to use the beach.  This 
right may be “acquired” through a “right of use or easement” or it may be 
“retained” in the public by virtue of continuous “right in the public since time 
immemorial.” Id.
            
The wet beaches are all owned by the State of Texas,[4] which leaves no dispute over the public’s 
right of use.  See Luttes v. State,  324 S.W.2d 167, 169, 191–92 (Tex. 1958); 
 Tex. Nat. Res. Code 
§§ 61.011, .161 (recognizing the public policies of the public’s right to 
use public beaches and the public’s right to ingress and egress to the 
sea).  However, the dry beach often is privately owned and the right to use 
it is not presumed under the OBA.[5]  The Legislature recognized that the 
existence of a public right to an easement in privately owned dry beach area of 
West Beach is dependant on the government’s 
establishing an easement in the dry beach or the public’s right to use of the 
beach “by virtue of continuous right in the public since time 
immemorial . . . .”  Tex. Nat Res. Code § 61.001(8).  
Accordingly, where the dry beach is privately owned, it is part of the “public 
beach” if a right to public use has been established on it.  See 
id.  Thus, a “public beach” includes but is broader than beaches owned 
by the State in those instances in which an easement for public use is 
established in the dry beach area.  Id.  Public beaches include 
Gulf-front wet beaches, State-owned dry beaches and private property in the dry 
beaches on which a public easement has been established.
            
In this case, before Hurricane Rita, Severance’s Kennedy Drive property was 
landward of the vegetation line.  After Hurricane Rita, because the storm 
moved the vegetation line landward, the property between Severance’s land and 
the sea that was subject to a public easement was submerged in the surf or 
became part of the wet beach.  Severance’s Kennedy Drive parcel and her 
house are no longer behind the vegetation line but neither are they located in 
the wet beach owned by the State.  At least a portion of Severance’s 
Kennedy Drive property and all of her house are now located in the dry 
beach.  The question is did the easement on the property seaward of 
Severance’s property “roll” onto Severance’s property?  In other words, is 
Severance’s house now located on part of the “public beach” and thereby subject 
to an enforcement action to remove it under the OBA?  From the Fifth 
Circuit’s statement of the case, we understand that no easement has been proven 
to exist on Severance’s property under the OBA or the common law.[6]  We also presume that there are no 
express limitations or reservations in Severance’s title giving rise to a public 
easement.  The answer to the rolling easement question thus turns on 
whether Texas common law recognizes such an inherent limitation on private 
property rights along Galveston’s West Beach, and if not, whether principles of 
Texas property law provide for a right of public use of beaches along the Gulf 
Coast.
2.  History of Beach Ownership 
Along the Gulf of Mexico
            
Long-standing principles of Texas property law establish parameters for our 
analysis.  It is well-established that the “soil covered by the bays, 
inlets, and arms of the Gulf of Mexico within tidewater limits belongs to the 
State, and constitutes public property that is held in trust for the use and 
benefit of all the people.”  Lorino v. 
Crawford Packing Co., 175 S.W.2d 410, 413 (Tex. 1943); Landry v. 
Robison, 219 S.W. 819, 820 (Tex. 1920) (“For our decisions are unanimous in 
the declaration that by the principles of the civil and common law, soil under 
navigable waters was treated as held by the state or nation in trust for the 
whole people.”[7]); De Meritt 
v. Robison Land Comm’r, 116 S.W. 796, 797 (Tex. 
1909) (holding “[i]n the contemplation of law,” soil 
lying below the line of ordinary high tide, “was not land, but water”); see 
also Tex. Nat. Res. Code § 
11.012(c) (“The State of Texas owns the water and the beds and shores of the 
Gulf of Mexico and the arms of the Gulf of Mexico within the boundaries provided 
in this section, including all land which is covered by the Gulf of Mexico and 
the arms of the Gulf of Mexico either at low tide or high tide.”).  These 
lands are part of the public trust, and only the Legislature can grant to 
private parties title to submerged lands that are part of the public 
trust.  Lorino, 175 S.W.2d at 414; see 
also TH Invs., Inc. v. Kirby Inland Marine, L.P., 
218 S.W.3d 173, 182–83 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) 
(holding that lands submerged in the Gulf belong to the State) (citations 
omitted), cert. denied, ___ U.S. ___, 129 S. Ct. 899 (2009).
            
Current title to realty and corresponding encumbrances on the property may be 
affected in important ways by the breadth of and limitations on prior grants and 
titles.  We review the original Mexican and Republic of Texas grants and 
patents to lands abutting the sea in West Galveston Island.[8]  The Republic of Texas won her 
independence from Mexico in 1836.  Mexico’s laws prohibited colonization of 
land within ten leagues of the coast without approval from the president.  
General Law of Colonization, art. 4 (Mex., Aug. 18, 
1824), reprinted in 1 H.P.N. 
Gammel, The Laws of Texas 1822–1897 [hereinafter “Gammel, The Laws of Texas”], at 97, 97 
(Austin, Gammel Book Co. 1898).[9]  Title to West Beach property 
was first granted in November 1840 by the Republic of Texas to Levi Jones and 
Edward Hall in a single patent (the “Jones and Hall Grant”).  See Seaway Co. v. Att’y Gen., 375 
S.W.2d 923, 928 (Tex. Civ. App.—Houston 1964, writ ref’d n.r.e.).[10]  After admission to the 
Union in 1845, the State of Texas by legislation in 1852 and 1854 first 
confirmed the validity of the Jones and Hall Grant and then disclaimed title to 
those lands.  In 1852, the State declared that it “hereby releases and 
relinquishes forever, all of her title to such lots on Galveston Island as are 
now in the actual possession and occupation of persons who purchased under the 
[Jones and Hall Grant].”  Act approved Feb. 16, 1852, 4th Leg., 
R.S., ch. 119, § 1, 1852 Tex. Gen. Laws 142, 142, 
reprinted in 3 Gammel, The Laws 
of Texas, at 1020, 1020; Act of Feb. 8, 1854, 5th Leg., R.S., ch. 73, § 1, 1854 Tex. Special Laws 125, 125–26, 
reprinted in 4 Gammel, The Laws 
of Texas, at 125, 125–26 (confirming the 1840 Jones and Hall Grant and 
“disclaim[ing] any title in and to the lands described 
in said patent, in favor of the grantees and those claiming under 
them”).[11]  In 1854, the State affirmed its 
intent to grant ownership of all land in West Beach up to the public trust to 
Jones and Hall with no express reservation of either title to the property or a 
public right to use the beaches.[12]  The government relinquished all 
title in the Jones and Hall Grant, without reserving any right to use of the 
property.  The Republic could have reserved the right of the public to use 
the beachfront property, “but the plain language of the grant shows the Republic 
of Texas did not do so.”  Seaway Co., 375 S.W.2d 
at 929.  All the Gulf beachland in West 
Galveston Island that extended to the public trust was conveyed to private 
parties by the sovereign Republic of Texas as later affirmed by the State of 
Texas.
            
Having established that the State of Texas owned the land under Gulf tidal 
waters, the question remained how far inland from the low tide line did the 
public trust—the State’s title—extend.  We answered that question in Luttes v. State.  This Court held that 
the delineation between State-owned submerged tidal lands (held in trust for the 
public) and coastal property that could be privately owned was the “mean higher 
high tide” line under Spanish or Mexican grants and the “mean high tide” line 
under Anglo-American law.[13]  324 S.W.2d 167, 191–92 (Tex. 
1958).  The wet beach is owned by the State as part of the public trust, 
and the dry beach is not part of the public trust and may be privately 
owned.  See generally id.  Prior to Luttes, there was a question whether the public trust 
extended to the vegetation line.  Luttes 
established the landward boundary of the public trust at the mean high tide 
line.  Luttes, 324 
S.W.2d at 187–88. 
            
These boundary demarcations are a direct response to the ever-changing nature of 
the coastal landscape because it is impractical to apply static real property 
boundary concepts to property lines that are delineated by the ocean’s 
edge.  The sand does not stay in one place, nor does the tide line.  
While the vegetation line may appear static because it does not move daily like 
the tide, it is constantly affected by the tide, wind, and other weather and 
natural occurrences.
            
A person purchasing beachfront property along the Texas coast does so with the 
risk that their property may eventually, or suddenly, recede into the 
ocean.  When beachfront property recedes seaward and becomes part of the 
wet beach or submerged under the ocean, a private property owner loses that 
property to the public trust.  We explained in State v. Balli:
Any distinction that can be drawn between the alluvion of rivers and accretions cast up by the sea must 
arise out of the law of the seashore rather than that of accession and be based 
. . . upon the ancient maxim that the seashore is common property and never 
passes to private hands . . . . [This] remains as a guiding principle in all or 
nearly all jurisdictions which acknowledge the common law . . . .  
 
190 S.W.2d 71, 100 
(Tex. 1945).  Likewise, if the ocean 
gradually recedes away from the land moving the high tide line seaward, a 
private property owner’s land may increase at the expense of the public 
trust.  See id.  Regardless of these changes, the boundary 
remains fixed (relatively) at the mean high tide line.  See Luttes, 324 S.W.2d at 
191–93.  Any other approach would leave locating that 
boundary to pure guesswork.  See Coastal Indus. Water Auth. v. York, 
532 S.W.2d 949, 952 n.1 (Tex. 1976).
            
In 1959, the Legislature enacted the Open Beaches Act to address responses to 
the Luttes opinion establishing the 
common law landward boundary of State-owned beaches at the mean high tide 
line.  The Legislature feared that this holding might “give encouragement 
to some overanxious developers to fence the seashore” as some private landowners 
had “erected barricades upon many beaches, some of these barricades extending 
into the water.”  Tex. Legis. Beach Study Comm., 57th Leg., R.S., The Beaches and Islands 
of Texas [hereinafter “Beach Study 
Comm., Beaches and Islands of Texas”] 
1 (1961), available at http://www.lrl.state.tx.us/scanned/interim/56/56_B352.pdf; 
Tex. Leg. Interim Beach Study Comm., 65th Leg., 
R.S., Footprints on the Sands of Time [hereinafter “Beach Study Comm., 
Footprints”] 22 (1969), available at 
http://www.lrl.state.tx.us/scanned/interim/60/B352.pdf.  
The OBA declared the State’s public policy for the public to have “free and 
unrestricted access” to State-owned beaches, the wet beach, and the dry beach 
where the public “has acquired” an easement or other right to use that 
property.  Tex. Nat. Res. Code § 
61.011(a).  To enforce this policy, the OBA prohibits 
anyone from creating, erecting, or constructing any “obstruction, barrier, or 
restraint that will interfere with the free and unrestricted right of the 
public” to access Texas beaches where the public has acquired a right of use or 
easement.  Id. § 61.013(a).  The Act 
authorizes the removal of barriers or other obstructions on 
state-owned beaches to which the public has the right of 
ingress and egress bordering on the seaward shore of the Gulf of Mexico or any 
larger area extending from the line of mean low tide to the line of vegetation 
bordering on the Gulf of Mexico if the public has acquired a right of use 
or easement to or over the area by prescription, dedication, or has retained 
a right by virtue of continuous right in the public.
  
Id. §§ 61.012, .013(a) (emphasis added). 

            
The OBA does not alter Luttes.  It 
enforces the public’s right to use the dry beach on private property where an 
easement exists and enforces public rights to access and use State-owned 
beaches.  Therefore, the OBA, by its terms, does not create or diminish 
substantive property rights.  Beach 
Study Comm., Footprints 22 (stating that the “statute cannot truly be 
said to create any new rights”); Richard J. Elliott, Open Beaches Act:  
Public Rights to Beach Access, 28 Baylor L. Rev. 383, 392 (1976) (“In 
terms of pure substantive law, the Open Beaches Act probably creates no rights 
in the public which did not previously exist under the common law.”).  In 
promulgating the OBA, the Legislature seemed careful to preserve private 
property rights by emphasizing that the enforcement of public use of private 
beachfront property can occur when a historic right of use is retained in the 
public or is proven by dedication or prescription.  See Tex. Nat. Res. Code § 61.013(a), (c).  The 
OBA also specifically disclaims any intent to take rights from private owners to 
Gulf-shore beach property.  Id. § 61.023; see Seaway Co., 375 
S.W.2d at 930 (“There is nothing in the Act which seeks to take rights from an 
owner of land.”).  Within these acknowledgments, the OBA proclaims that 
beaches should be open to the public.  Certainly, the OBA guards the right 
of the public to use public beaches against infringement by private 
interests.  But, as explained, the OBA is not contrary to private property 
rights at issue in this case under principles of Texas law.  The public has 
a right to use the West Galveston beaches when the State owns the beaches or the 
government obtains or proves an easement for use of the dry beach under the 
common law or by other means set forth in the OBA.[14]
            
In 1969, the Legislature’s Interim Beach Study Committee, chaired by Senator 
A.R. Schwartz of Galveston County, confirmed the view that:
[The OBA] does not, and can 
not, declare that the public has an easement on the beach, a right of 
access over private property to and from the State-owned beaches bordering on 
the Gulf of Mexico. An easement is a property interest; the State can no more 
impress private property with an easement without compensating the owner of the 
property than it can build a highway across such land without paying the 
owner.
 
Beach 
Study Comm., Footprints 17.  The Interim Beach Study 
Committee was created, among other reasons, to assure that beach development be 
undertaken to serve the best interests of the people of Texas and to study 
methods of procuring right-of-ways for roads parallel to the beaches, easements 
for ingress and egress to the beach, parking for beach access, methods for 
negotiating with landowners for additional easements, and rights for landowners 
to construct works for the protection of their property.  Id. at 
1–2.  
B.  Background on Severance’s 
Property
            
Carol Severance purchased the Kennedy Drive property on Galveston Island’s West 
Beach in 2005.  The Fifth Circuit explained that “[n]o easement has ever 
been established on [her] parcel  via 
prescription, implied dedication, or continuous right.”  566 F.3d at 494.  The State obtained the Hill 
judgment in 1975 that encumbered a strip of beach seaward of Severance’s 
property. Severance’s Kennedy Drive parcel was not included in the 1975 
judgment.  However, the parties dispute whether or not Severance’s parcel 
was ever subject to a public easement.
            
In 1999, the Kennedy Drive house was on a Texas General Land Office (GLO) list 
of approximately 107 Texas homes located seaward of the vegetation line after 
Tropical Storm Frances hit the island in 1998.  In 2004, the GLO again 
determined that the Kennedy Drive home was located “wholly or in part” on the 
dry beach in 2004, but did not threaten public health or safety and, at the 
time, was subject to a GLO two-year moratorium order.  When Severance 
purchased the property, she received an OBA-mandated disclosure explaining that 
the property may become located on a public beach due to natural processes such 
as shoreline erosion, and if that happened, the State could sue seeking to 
forcibly remove any structures that come to be located on the public 
beach.  See Tex. Nat. Res. Code 
§ 61.025.  Winds attributed to Hurricane Rita 
shifted the vegetation line further inland in September 2005.  In 2006, the 
GLO determined that Severance’s house was entirely within the public 
beach.
            
The moratorium for enforcing the OBA on Severance’s properties expired on June 
7, 2006.  Severance received a letter from the GLO requiring her to remove 
the Kennedy Drive home because it was located on a public beach.  A second 
letter reiterated that the home was in violation of the OBA and must be removed 
from the beach, and offered her $40,000 to remove or relocate it if she acted 
before October 2006.  She initiated suit in federal court.  The Fifth 
Circuit certified questions of Texas law to this Court.
II.  
Dynamic Public Beachfront Easements
            
The first certified 
question asks if Texas recognizes “a ‘rolling’ public beachfront access 
easement, i.e., an easement in favor of the public that allows access to 
and use of the beaches on the Gulf of Mexico, the boundary of which easement 
migrates solely according to naturally caused changes in the location of the 
vegetation line, without proof of prescription, dedication, or customary rights 
in the property so occupied?”  566 F.3d at 
504.  We have never held that the State has a right in privately 
owned beachfront property for public use that exists without proof of the normal 
means of creating an easement.  And there is no support presented 
for the proposition that, during the time of the Republic of Texas or at the 
inception of our State, the State reserved the oceanfront for public use.  
In fact, as discussed above, the Texas Legislature expressly disclaimed any 
interest in title obtained from the Jones and Hall Grant after our State was 
admitted to the Union.  See Section I.A.2, supra; see also 
Seaway Co., 375 S.W.2d at 928 (“On November 28, 1840, the Republic of Texas 
issued its patent to Levi Jones and Edward Hall to 18,215 acres of land on 
Galveston Island.  This grant covered all of Galveston Island except the 
land covered by the Menard Grant covering the east portion of the 
Island.”).  Therefore, considering the absence of any historic custom or 
inherent title limitations for public use on private West Beach property, 
principles of property law answer the first certified question.
            
Easements exist for 
the benefit of the easement holder for a specific purpose.  An easement 
does not divest a property owner of title, but allows another to use the 
property for that purpose.  See Marcus Cable Assocs., L.P. v. Krohn, 90 S.W.3d 697, 700 (Tex. 2002) (explaining that 
an easement relinquishes a property owner’s right to exclude someone from their 
property for a particular purpose) (citations omitted).  The 
existence of an easement “in general terms implies a grant of unlimited 
reasonable use such as is reasonably necessary and convenient and as little 
burdensome as possible to the servient owner.”  
Coleman v. Forister, 514 
S.W.2d 899, 903 (Tex. 1974).  An easement appurtenant “defines the 
relationship of two pieces of land”—a dominant and a servient estate.  See 7 Thompson on Real Property § 
60.02(f)(1), at 469 (David A. Thomas, ed. 
2006).  Because the easement holder is the dominant estate owner and 
the land burdened by the easement is the servient 
estate, the property owner may not interfere with the easement holder’s right to 
use the servient estate for the purposes of the 
easement.  Drye v. Eagle Rock Ranch, 
Inc., 364 S.W.2d 196, 207 (Tex. 1963) (citation omitted); Vrazel v. Skrabanek, 
725 S.W.2d 709, 711 (Tex. 1987). 
            
Easement boundaries 
are generally static and attached to a specific portion of private 
property.  See Holmstrom v. Lee, 26 S.W.3d 
526, 533 (Tex. App.—Austin 2000, no pet.) (“Once established, the location or 
character of the easement cannot be changed without the consent of the 
parties.”); see also 7 Thompson 
on Real Property § 60.04(c)(1)(ii), at 
538–40.  “As a general rule, once the location of an 
easement has been established, neither the servient 
estate owner nor the easement holder may unilaterally relocate the 
servitude.”  Jon W. Bruce & James W. Ely, Jr., 
The Law of Easements and Licenses in 
Land § 7:13, at 7-30 (2009).  Therefore, a new easement must 
be re-established for it to encumber a part of the parcel not previously 
encumbered. 
 See 
id.  
            
While the boundaries of easements on the beach are necessarily dynamic due to 
the composition of the beach and its constantly changing boundaries, easements 
for public use of privately owned dry beach do not necessarily burden the area 
between the mean high tide and vegetation lines when the land originally 
burdened by the easement becomes submerged by the ocean.  They do not 
automatically move to the new properties; they must be proven.
            
Like easements, real property boundaries are generally static as well.  But 
property boundaries established by bodies of water are necessarily 
dynamic.  Because those boundaries are dynamic due to natural forces that 
affect the shoreline or banks, the legal rules developed for static boundaries 
are somewhat different.  See York, 532 S.W.2d at 952 (discussing erosion, accretion, 
and avulsion doctrines affecting property boundaries and riparian ownership in 
the Houston Ship Channel). 
            
The nature of littoral property boundaries abutting the ocean not only 
incorporates the daily ebbs and flows of the tide, but also more permanent 
changes to the coastal landscape due to weather and other natural 
forces.[15]  Shoreline property ownership is 
typically delineated by boundaries such as the mean high tide and vegetation 
lines because they are easy to reference and locate.  Sand and water are 
constantly moving and changing the landscape whether it is gradual and 
imperceptible or sudden and perceptible.
            
Courts generally adhere to the principle that littoral property owners gain or 
lose land that is gradually or imperceptibly added to or taken away from their 
banks or shores through erosion, the wearing away of 
land, and accretion, the enlargement of the land.  Id. at 952.  Avulsion, as derived from English 
common law, is the sudden and perceptible change in land and is said not to 
divest an owner of title.  Id.  We have never applied the 
avulsion doctrine to upset the mean high tide line boundary as established by 
Luttes.[16]  324 S.W.2d at 191. 
            
Property along the Gulf of Mexico is subjected to seasonal hurricanes and 
tropical storms, on top of the every-day natural forces of wind, rain, and tidal 
ebbs and flows that affect coastal properties and shift sand and the vegetation 
line.  This is an ordinary hazard of owning littoral property.  And, 
while losing property to the public trust as it becomes part of the wet beach or 
submerged under the ocean is an ordinary hazard of ownership for coastal 
property owners, it is far less reasonable to hold that a public easement can 
suddenly encumber an entirely new portion of a landowner’s property that was not 
previously subject to that right of use.  See, e.g., Phillips 
Petrol., 484 U.S. at 482 (discussing the importance of “honoring reasonable 
expectations in property interests[,]” but ultimately 
holding the property owner’s expectations in that situation were 
unreasonable).  Gradual movement of the vegetation line 
and mean high tide line due to erosion or accretion have very different 
practical implications.
            
Like littoral property boundaries along the Gulf Coast, the boundaries of 
corresponding public easements are also dynamic.  The easements’ boundaries 
may move according to gradual and imperceptible changes in the mean high tide 
and vegetation lines.  However, if an avulsive 
event moves the mean high tide line and vegetation line suddenly and perceptibly 
causing the former dry beach to become part of State-owned wet beach or 
completely submerged, the private property owner is not automatically deprived 
of her right to exclude the public from the new dry beach.  In those 
situations, when changes occur suddenly and perceptibly to materially alter 
littoral boundaries, the land encumbered by the easement is lost to the public 
trust, along with the easement attached to that land.  Then, the State may 
seek to establish another easement as permitted by law on the newly created dry 
beach to enforce an asserted public right to use private land.
            
It would be an unnecessary waste of public resources to require the State to 
obtain a new judgment for each gradual and nearly imperceptible movement of 
coastal boundaries exposing a new portion of dry beach.  These easements 
are established in terms of boundaries such as the mean high tide line and 
vegetation line; presumably public use moves according to and with those 
boundaries so the change in public use would likewise be imperceptible.  
Also, when movement is gradual, landowners and the State have ample time to 
reach a solution as the easement slowly migrates landward with the vegetation 
line.  Conversely, when drastic changes expose new dry beach and the former 
dry beach that may have been encumbered by a public easement is now part of the 
wet beach or completely submerged under water, the State must prove a new 
easement on the area.  Because sudden and perceptible changes by nature 
occur very quickly, it would be impossible to prove continued public use in the 
new dry beach, and it would be unfair to impose such drastic restrictions 
through the OBA upon an owner in those circumstances without compensation.  
See Westgate, Ltd. v. State, 843 S.W.2d 448, 452 (Tex. 1992) (explaining 
the circumstances from which an action for inverse condemnation may arise). 

            
If the public has an easement in newly created dry beach, as with any other 
property, the State must prove it.  Having divested title to all such West 
Beach property in the early years of the Republic, the State of Texas can only 
acquire or burden private property according to the law.  Thus, a public 
beachfront easement in West Beach, although dynamic, does not roll.  The 
public loses that interest in privately owned dry beach when the land to which 
it is attached becomes submerged underwater.  While these boundaries are 
somewhat dynamic to accommodate the beach’s everyday movement and imperceptible 
erosion and accretion, the State cannot declare a public right so expansive as 
to always adhere to the dry beach even when the land the easement originally 
attached to is eroded.  This could divest private owners of significant 
rights without compensation because the right to exclude is one of the most 
valuable and fundamental rights possessed by property owners.  See Town 
of Flower Mound v. Stafford Estates Ltd. P’ship, 
135 S.W.3d 620, 634 (Tex. 2004) (referring to the right to exclude as “‘one of 
the most essential sticks in the bundle of rights that are commonly 
characterized as property’”) (quoting Dolan v. City of Tigard, 512 U.S. 
374, 393 (1994)).  We have never held the dry beach to be encompassed in 
the public trust.  See Luttes, 324 S.W.2d at 191–92.
            
On this issue of first impression, we hold that Texas does not recognize a 
“rolling” easement on Galveston’s West Beach.  Easements for public use of 
private dry beach property do change along with gradual and imperceptible 
changes to the coastal landscape.  But, avulsive 
events such as storms and hurricanes that drastically alter pre-existing 
littoral boundaries do not have the effect of allowing a public use easement to 
migrate onto previously unencumbered property.  This holding shall not be 
applied to use the avulsion doctrine to upset the long-standing boundary between 
public and private ownership at the mean high tide line.  That result would 
be unworkable, leaving ownership boundaries to mere guesswork.  The 
division between public and private ownership remains at the mean high tide line 
in the wake of naturally occurring changes, even when boundaries seem to change 
suddenly.[17]  The State, as always, may act 
within a valid exercise of police power to impose reasonable regulations on 
coastal property or prove the existence of an easement for public use, 
consistent with the Texas Constitution and real property law.
            
The dissent would reach a different result by arguing the public has the right 
to use the dry beach regardless of the boundaries of private property or the 
constitutional protections accorded those rights.  That approach would 
raise constitutional concerns.  “To say that the appropriation of a public 
easement across a landowner’s premises does not constitute the taking of a 
property interest but rather . . . ‘a 
mere restriction on its use,’ . . . is to use words in a manner 
that deprives them of all their ordinary meaning.”  Nollan v. Cal. Coastal Comm’n, 
483 U.S. 825, 831 (1987) (citation omitted);  see Elliott, 28 Baylor L. Rev. at 385–86 (“Since a 
simple legislative declaration of policy [such as declaring a right to an 
easement across private property], cannot provide the requisite due process, the 
affirmative policy statement of the Open Beaches Act, without more would appear 
patently unconstitutional.  The legislature has apparently sought to avoid 
such constitutional problems by qualifying affirmatively-declared public rights 
with an interesting condition precedent. That condition is that the public must 
have already acquired these identical rights under the common law 
doctrines of prescription or dedication.”).
            
According to the dissent, an easement could remain in the dry beach even if the 
land encumbered by the original easement becomes submerged by the ocean and the 
dry beach is composed of new land that was not previously encumbered by an 
easement.  Its argument is likewise based on the premise that an alleged 
easement previously established did not just encumber the dry beach portion of 
Severance’s parcel, but that it encumbered the entire lot.  This is 
inconsistent with easement law.  See Holmstrom 
v. Lee, 26 S.W.3d 526, 533 (Tex. App.—Austin 2000, no pet.) (“Once 
established, the location or character of the easement cannot be changed without 
the consent of the parties.”); 7 Thompson on Real Property § 
60.04(c)(1)(ii), at 538–40.  While the specific 
use granted by an easement is a fundamental consideration, there is no law to 
support the dissent’s contention that an easement forever remains in the dry 
beach (i.e., can move onto a new portion of the parcel or a different parcel) 
absent mutual consent.  See Jon W. Bruce & James W. Ely, The Law of 
Easements and Licenses in Land § 7:13, at  
7-30 (2009).  This would result in depriving oceanfront property 
owners of a substantial right (the right to exclude) without requiring 
compensation or proof of actual use of the property allegedly encumbered 
whenever natural forces cause the vegetation line to move inland so that 
property not formerly part of the dry beach becomes part of the dry beach.  
This argument blurs the line between ownership and right to use of a portion of 
a parcel—the dry beach—and is in tension with our decision in Luttes that set the boundary between State and 
privately owned property at the mean high tide line.  See 324 S.W.2d at 191–92.
            
The dissent further dismisses Severance’s grievance as a gamble she took and 
lost by purchasing oceanfront property in Galveston and argues that she would 
not be entitled to compensation even though an easement had never been 
established on the portion of her parcel that is now in the dry beach.  It 
notes the OBA requirement of disclosure in sales contracts of the risk that 
property could become located on a public beach and subject to an easement in 
the future.  See Tex. Nat. Res. Code § 
61.025.  This is incorrect for three reasons.  
First, beachfront property owners take the risk that their property could be 
lost to the sea, not that their property will be encumbered by a easement they never agreed to and that the State never had 
to prove.  Second, putting a property owner on notice that the State may 
attempt to take her property for public use at some undetermined point in the 
future does not relieve the State from the legal requirement of proving or 
purchasing an easement nor from the constitutional requirement of compensation 
if a taking occurs.  We do not hold that circumstances do not exist under 
which the government can require conveyance of property or valuable property 
rights, such as the right to exclude, but it must pay to validly obtain such 
right or have a sufficient basis under its police power to do so. 
 See Nollan, 
483 U.S. at 841–42 (noting that public use of private beaches may be a “good 
idea” but “if [the state] wants an easement across [private] property, it must 
pay for it”).  As Justice Oliver Wendell Holmes, Jr. 
explained, “[A] strong public desire to improve the public condition is not 
enough to warrant achieving the desire by a shorter cut than the constitutional 
way of paying for the change.”  Pa. Coal Co. v. 
Mahon, 260 U.S. 393, 416 (1922).  Third, simply advising in a 
disclosure that the State may attempt to enforce an easement on privately owned 
beachfront property does not dispose of the owner’s rights.
            
Our  holding does not necessarily preclude a 
finding that an easement exists.  We have determined that the history of 
land ownership in West Beach refutes the existence of a public easement by 
virtue of continuous right “in the public since time immemorial, as recognized 
in law and custom,”  Tex. Nat. Res. Code § 61.001(8), and Texas 
law does not countenance an easement migrating onto previously unencumbered 
beachfront property due to the Hurricane.  We do not have a sufficient 
record to determine whether an easement has been proven, and the question was 
not certified.  See id.
            
The public may have a superior interest in use of privately owned dry beach when 
an easement has been established on the beachfront.  But it does not follow 
that the public interest in the use of privately owned dry beach is greater than 
a private property owner’s right to exclude others from her land when no 
easement exists on that land.  A few states have declared that 
long-standing property principles give the state (and therefore, the public) the 
right to all beachfront property or the right to use even privately owned 
beachfront property ipse dixit.  For example, the Oregon Supreme 
Court has held that the dry beach was subject to public use because the public 
use was inherent in the history of title to such lands.  Stevens v. City 
of Cannon Beach, 854 P.2d 449, 456–57 (Or. 1993) (citing State ex rel. 
Thornton v. Hay, 462 P.2d 671 (Or. 1969)).  The state of Oregon’s view 
is that private property owners along the beach “never had the property 
interests that they claim were taken” in the dry sand, the area between the high 
water line and vegetation line.  Id. at 
457.  The Court explained “the common-law doctrine of custom 
as applied to Oregon’s ocean shores . . . is not ‘newly 
legislated or decreed’; to the contrary, to use the words of the Lucas 
court, it ‘inhere[s] in the title itself, in the restrictions that background 
principles of the State’s law of property and nuisance already placed upon land 
ownership.”  Id., 854 P.2d at 456 (quoting Lucas v. S.C. 
Coastal Council, 505 U.S. 1003, 1004 (1992)).  The Supreme Court of 
Hawaii has held that issuance of a Hawaiian land patent confirms only a limited 
property interest as compared to typical land patents on the continental United 
States.  See Pub. Access Shoreline Haw. v. Haw. 
Cnty. Planning Comm’n, 903 P.2d 
1246 (Haw. 1995) (noting that “the western concept of exclusivity is not 
universally applicable in Hawai’i”).  New Jersey extends the public 
trust doctrine to encompass the dry beach as well as the wet beach.  See 
Borough of Neptune City v. Borough of Avon-by-the-Sea, 294 A.2d 47, 49 (N.J. 
1972) (“[T]he public trust doctrine dictates that the beach and the ocean waters 
must be open to all on equal terms and without 
preference . . . .”); see also Matthews v. 
Bay Head Improvement Ass’n, 471 A.2d 355, 365 
(N.J. 1984).  Unlike the West Beach of Galveston Island, these 
jurisdictions have long-standing restrictions inherent in titles to beach 
properties or historic customs that impress privately owned beach properties 
with public rights.
            
On the other hand, the Supreme Court of New Hampshire held that a statute that 
recognized a general recreational easement for public use in the “dry sand area” 
(comparable to our dry beach), violates the takings provisions of the state and 
federal constitutions, except for those areas where there is an “established and 
acknowledged public easement.”  Opinion of the 
Justices, 649 A.2d 604, 608 (N.H. 1994).  The public trust ends 
at the high water mark and private property extends landward beyond that. 
 Id.  The Supreme Court of Idaho applied the public trust 
doctrine to Lake Coeur d’Alene and held that the public trust doctrine was 
inapplicable in an action to force owners to remove a seawall.  State ex rel. Haman v. Fox, 594 P.2d 1093 (Idaho 
1979).  The private property at issue was obtained by patent from 
the U.S. Government in 1892 and the seawall was built above the mean high water 
mark of the lake.  Id.
            
A few Texas courts of appeals have reached results contrary to the holding in 
this opinion.  In Feinman, the court held 
that public easements for use of dry beach can roll with movements of the 
vegetation line.  717 S.W.2d at 110–11.  
Feinman could find no continuous right or 
custom dating from “time immemorial” or even back to the origins of the Republic 
or the State of Texas as a basis to encumber private property rights along West 
Beach.  Id.  Feinman states 
that “[c]ourts have upheld the concept of a rolling 
easement along rivers and the sea for many years without using the phrase 
‘rolling easement,’” and cites, but does not discuss, seven cases for its 
holding.[18]  Id. at 110.  Only one 
of the opinions is from a Texas court, Luttes, 
and neither it nor the other cited cases discuss rolling or migratory 
easements.  Luttes established the 
landward boundary of title to the public trust along Gulf-front beaches.  
The Sotomura opinion is based on different 
common law notions of public rights to and limitations on private ownership of 
beaches in Hawaii, as discussed above.  Cnty. of Haw. v. Sotomura, 517 P.2d 
57, 61 (Haw. 1973).  Feinman neither 
addressed the legal significance of the Jones and Hall grant on the question of 
public encumbrance on private beach properties of Galveston’s West Beach nor 
identified any basis in Texas law or history for a continuous legal right or 
custom on which to ground the existence of a migratory easement.  One other 
appellate decision also recognizes a rolling easement, relying on Feinman.  Arrington v. Tex. 
Gen. Land Office, 38 S.W.3d 764, 766 (Tex. App.—Houston [14th Dist.] 2001, 
no pet.).
            
The first Texas case to address the concept of a rolling easement in Galveston’s 
West Beach is Matcha v. Mattox, 711 
S.W.2d 95 (Tex. App.—Austin 1986, writ ref’d n.r.e.).  In 1983, Hurricane Alicia shifted the 
vegetation line on the beach such that the Matchas’ 
home had moved into the dry beach.  The court held that legal custom—“a 
reflection in law of long-standing public practice”—supported the trial court’s 
determination that a public easement had “migrated” onto private property.  
Id. at 101.  The court reasoned that Texas 
law gives effect to the long history of recognized public use of Galveston’s 
beaches, citing accounts of public use dating back to time immemorial, 1836 in 
this case.  However, the legal custom germane to the matter is not the 
public use of beaches, it is whether the right in the 
public to a rolling easement has existed since time immemorial.  The Matcha court’s recognition of long-standing “custom” 
in public use of Galveston’s beaches misses the point of whether a custom 
existed to give effect to a legal concept of a rolling beach, which would impose 
inherent limitations on private property rights.  As explained above, the 
original patent of Galveston’s West Beach from the Republic to Jones and Hall 
refutes the existence of custom, as private owners who purchased beach 
properties obtained title without limitation on private rights of ownership and 
without encumbrances for public use.
            
We disapprove of courts of appeals opinions to the extent they are inconsistent 
with our holding in this case.  See Arrington v. Tex. Gen. Land 
Office, 38 S.W.3d 764, 766 (Tex. App.—Houston [14th Dist.] 2001, no pet.); 
Feinman, 717 S.W.2d at 108–11; Moody v. 
White, 593 S.W.2d 372, 379 (Tex. Civ. App.—Corpus Christi 1979, no writ); 
Matcha, 711 S.W.2d at 98–100;  See 
Neal E. Pirkle, Maintaining Public Access to 
Texas Coastal Beaches:  The Past and the Future, 46 Baylor L. Rev. 1093, 1106–07 (1994) 
(questioning whether the rolling easement theory should apply to easements by 
prescription and dedication).
III.  Conclusion
            
Land patents from the Republic of Texas in 1840, affirmed by legislation in the 
new State, conveyed the State’s title in West Galveston Island to private 
parties and reserved no ownership interests or rights to public use in 
Galveston’s West Beach.  Accordingly, there are no inherent limitations on 
title or continuous rights in the public since time immemorial that serve as a 
basis for engrafting public easements for use of private West Beach 
property.  Although existing public easements in the dry beach of 
Galveston’s West Beach are dynamic, as natural forces cause the vegetation and 
the mean high tide lines to move gradually and imperceptibly, these easements do 
not migrate or roll landward to encumber other parts of the parcel or new 
parcels as a result of avulsive events.  New 
public easements on the adjoining private properties may be established if 
proven pursuant to the Open Beaches Act or the common law.[19]  
 
 
 
 
 
 
                                                                                          
______________________________
                                                                                          
Dale Wainwright
                             
                                                             Justice
 
 
OPINION DELIVERED:  November 5, 2010








[1] We 
received amicus briefs from the Texas Landowners Council; the Texas Wildlife 
Foundation; the Surfrider Foundation; the Galveston 
Chamber of Commerce; Matthew J. Festa, Professor, 
South Texas College of Law; and Property Owners in Surfside Beach, Texas.
 

[2] 
 Severance owned three properties on West Beach—on Gulf Drive, 
Kennedy Drive and Bermuda Beach Drive.  Her original lawsuit included all 
three properties, but she only appealed the trial court’s judgment dismissing 
her claims as to two properties.  After oral argument to this Court on the 
certified questions, Severance sold one of two remaining homes at issue in a 
FEMA-funded buy-out program.  Only the Kennedy Drive property remains 
subject to this litigation.  

[3] In 
2009, Texas voters approved an amendment to the Constitution to protect the 
public’s right to “state-owned beach[es]” of the Gulf of Mexico.  Tex. Const. art. I, § 
33.  It protects public use of public beaches which, like the OBA, 
are defined as State-owned beaches and privately owned beachland “to which the public has acquired a right of use 
or easement . . . .”  Although not 
at issue in this case, the amendment provides: 
Section 1.  Article I, Texas Constitution, is amended by 
adding Section 33 to read as follows:
Sec. 33. (a) In this section, “public beach” means a 
state-owned beach bordering on the seaward shore of the Gulf of Mexico, 
extending from mean low tide to the landward boundary of state-owned submerged 
land, and any larger area extending from the line of mean low tide to the line 
of vegetation bordering on the Gulf of Mexico to which the public has acquired a 
right of use or easement to or over the area by prescription or dedication or 
has established and retained a right by virtue of continuous right in the public 
under Texas common law.
(b) The 
public, individually and collectively, has an unrestricted right to use and a 
right of ingress to and egress from a public beach.  The right granted by 
this subsection is dedicated as a permanent easement in favor of the public.
(c) The 
legislature may enact laws to protect the right of the public to access and use 
a public beach and to protect the public beach easement from interference and 
encroachments.
                                
(d) This section does not create a private right of enforcement.

[4] 
State-owned beaches are the strips of coastal property “between mean low 
tide and mean high tide, which runs along the entire Gulf Coast, regardless of 
whether the property immediately landward is privately or state owned.”  
Richard J. Elliott, The Texas Open Beaches 
Act: Public Rights to Beach Access, 28 Baylor L. Rev. 383, 384 
(1976).

[5] The OBA 
includes two stated presumptions for purposes of ingress and egress to the 
sea.  It provides that  the title of private 
owners of dry beach area in Gulf beaches “does not include the right to prevent 
the public from using the area for ingress and egress to the sea.”  Tex. Nat. Res. Code § 
61.020(a)(1).  In 1991, the OBA was amended to add 
a second presumption that imposed “on the area a common law right or easement in 
favor of the public for ingress and egress to the sea.”  Id. § 
61.020(a)(2).  Although the 
constitutionality of these presumptions has been questioned, that issue is not 
before us.  See Seaway Co. v. Att’y Gen., 375 S.W.2d 923, 929–30 (Tex. Civ. 
App.—Houston 1964, writ ref’d n.r.e.).

[6]  That issue is not before us, but it may be 
addressed in the federal courts.

[7] “The 
bays, inlets, and other waters along the Gulf Coast which are subject to the ebb 
and flow of the tide of the Gulf of Mexico are defined as ‘navigable 
waters.’”  Lorino, 175 S.W.2d at 413 
(citing City of Galveston v. Mann, 135 Tex. 319 (1940); Crary v. Port Author Channel & Dock Co., 
92 Tex. 275 (1898)).

[8] The 
briefs and the record do not address the early land grant of Galveston’s West 
Beach.

[9] The 
Mexican federal government “feared that an influx of foreigners along the border 
of the United States, or along the coast, might become too powerful, and betray 
the country to a foreign power.”  Lewis N. Dembitz, A Treatise on Land Titles in the United States 
§ 73, at 558 (1895).

[10] See 
also Jones and Hall Grant Papers, available at 
http://wwwdb.glo.state.tx.us/central/LandGrants/LandGrantsSearch.cfm (search 
abstract number 121, Galveston County).

[11] The 
act reads: “Be it enacted by the Legislature of the State of Texas, That the 
patent issued by the Commissioner of the General Land[ O]ffice, on the twenty-eighth day of November, eighteen 
hundred and forty, to Levi Jones and Edward Hall, for lands on Galveston Island, 
be, and the same is hereby confirmed, and the State of Texas disclaims any title 
in and to the lands described in said patent, in favor of the grantees and those 
claiming under them.”  Act of Feb. 8, 1854, 5th Leg., R.S., ch. 73, § 1, 1854 Tex. Special Laws 125, 125–26, 
reprinted in 4 Gammel, The Laws 
of Texas, at 125, 125–26.

[12] There is some historical evidence that the Republic 
made an abortive attempt to parcel and sell title to lands on West Galveston 
Island starting in 1837.  See Act approved June 12, 1837, 1st Cong., 
1 Repub. Tex. Laws 267, 267 (1838), reprinted in 1Gammel, The Laws of Texas, at 1327, 
1327 (authorizing sales of title to lots on Galveston Island by auction); Annual 
Report of the Secretary of the Treasury, Nov. 1839, reprinted in 3 Harriet Smither, Journals of the Fourth 
Congress of the Republic of Texas 1839–1840, at 35, 45 (Austin, Texas 
State Library 1931) (reporting treasury receipts “on account Sales Galveston 
Island”).  In an 1860 mandamus proceeding, in light of then-lingering 
questions about the validity of Jones and Hall’s title to West Beach, a district 
court directed the land commissioner to issue a single land patent to Jones and 
Hall for all of West Beach.  See Franklin v. 
Kesler, 25 Tex. 138, 142–43(1860) (describing the patent issued pursuant to 
mandamus).  The February 15, 1852 act expressly vested title in 
those claiming successor title under the Jones and Hall 
Grant, and the February 8, 1854 act confirms the Jones and Hall Grant in 
its entirety.  Further, Wilcox v. Chambers confirmed that if title 
of coastal lands were granted to foreigners (non-Mexican individuals) prior to 
1840, the grants are presumed void absent specific approval by the Mexican 
President.  26 Tex. 181, 187 (1862).
                
Legislation and a patent (the “Menard Grant”) conveyed oceanfront property on 
the east side of Galveston Island to private parties in 1836 and 1838.  
Mayor, Aldermen & Inhabitants of the City of 
Galveston v. Menard, 23 Tex. 349, 391 (1859). 

[13] 
Severance’s parcel is not subject to Spanish or Mexican law. 
 So, we refer to the mean high tide line throughout this opinion.  
On January 20, 1840, Texas adopted the common law of England as its rule of 
decision, to the extent it was not inconsistent with 
the Constitution of the Republic of Texas or acts of its Congress.  Act 
approved Jan. 20, 1840, 4th Cong., R.S., § 1, 1840 Repub. Tex. Laws 3, 3–4, 
reprinted in 2 Gammel, The Laws 
of Texas, at 177, 177–80; Miller v. Letzerich, 49 S.W.2d 404, 408 (Tex. 1932) (explaining 
that “the validity and legal effect of contracts and of grants of land made 
before the adoption of the common law must be determined according to the civil 
law in effect at the time of the grants”).  Because the Jones and Hall 
Grant was made in November 1840, land granted under 
that patent is governed by the common law.  See William Gardner 
Winters, Jr., The Shoreline for Spanish and 
Mexican Grants in Texas, 38 Tex. L. 
Rev. 523 (1960) (discussing the history of Spanish and Mexican land 
patents and common law basis for shoreline boundaries). 

[14] In 
1961, The Texas Legislative Beach Study Committee further evidenced its 
recognition that private property rights exist in the dry beaches by proposing 
to the 57th Legislature that it come up with practical methods for not only 
procuring easements for ingress and egress to beaches but also methods of 
“negotiations with landowners for additional easements” for the “use and 
pleasure of the public, provided such lands or easements can be obtained without 
cost to the State.” Beach Study Comm., 
Beaches and Islands of Texas xi. If Gulf-front dry beach property were 
State-owned or already impressed with an easement for public use (as compared to 
ingress and egress), negotiations to obtain them would not be necessary. 


[15] 
“Riparian” means “[o]f, relating to, or located on the bank of a river or 
stream (or occasionally another body of water, such as a lake).”  Black’s Law Dictionary 1352 (8th ed. 
2004).  “Littoral” means “[o]f or relating to the coast 
or shore of an ocean, sea, or lake.”  Black’s Law Dictionary 952 (8th ed. 
2004).

[16] Some 
states apply avulsion to determine that the mean high tide line as it existed 
before the avulsive event remains the boundary between 
public and private ownership of beach property after the avulsive event; therefore, allowing private property owners 
to retain ownership of property that becomes submerged under the ocean.  
See Walton Cnty. v. Stop the Beach Renourishment, 998 So. 2d 1102, 1116–17 (Fla. 2008), 
aff’d sub nom. Stop the Beach Renourishment, Inc. v. Fla. Dep’t of Envtl. Prot., ___ U.S. ___, 130 S. Ct. 2592 (2010); Cinque 
Bambini P’ship v. State, 491 So. 2d 508, 
520 (Miss. 1986).  We have not accepted such an expansive view of 
the doctrine, but, we need not make that determination in this case.

[17] We 
also do not address how artificial accretions or other artificial changes in the 
coastal landscape affect ownership.  New Jersey 
v. New York, 523 U.S. 767, 784 (1998) (explaining the littoral 
boundaries remained as they were before artificial land-filling increased the 
surface area of Ellis Island). 

[18] The 
cited cases are Barney v. City of Keokuk, 94 U.S. 324, 339–40 (1876); 
Luttes, 324 S.W.2d 167; Cnty. of Haw. v. Sotomura, 517 P.2d 57, 61 (Haw. 1973); Horgan v. Town Council, 80 A. 271 (R.I. 1911); 
City of Chicago v. Ward, 48 N.E. 927 (Ill. 1897); Godfrey v. City of 
Alton, 12 Ill. 29, 36 (1850); and Mercer v. Denne, [1905] 2 Ch. 538 (Eng.).  Feinman issued two months after Matcha and does not cite it for support.

[19] 
 We have not addressed in this opinion state police power, nuisance 
or other remedies that may authorize the government to act in the interests of 
the health, safety and welfare of the 
public.